John W. CARSON and Joanna Holland, Plaintiffs-Appellants,

v.

ALLIED NEWS COMPANY, an Illinois Corporation, and National Insider, Inc., an Illinois Corporation, Defendants-Appellees.

No. 75–1763.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 15, 1975.

Decided Jan. 23, 1976.

Rehearing and Rehearing En Banc Denied March 8, 1976.

Paul M. Levy, Chicago, Ill., for plaintiffs-appellants.

Burton Joseph, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, and CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The principal issue on appeal is whether summary judgment was properly entered against "public figures" prosecuting a libel suit or whether "actual malice" was shown with convincing clarity to warrant a jury determination of that issue under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

I

The plaintiffs John W. Carson and Joanna Holland brought this diversity action, seeking compensatory and punitive damages from the defendants Allied News Company and National Insider, Inc., for an allegedly libelous article which appeared in the April 9, 1972 issue of the National Insider, a tabloid periodical. The front page of the periodical carried the headlines "N.B.C. Pays For Carson's Love Life! Move To Hollywood Is Just So Johnny Can Be Near Miss Holland." The story, under the by-line of Evart Alimine, the nom de plume of Evan Crawley, a full time staff writer employed by the defendants, carried the headline, "Johnny Carson Is Moving 'Tonight Show' To Hollywood So He Could Be Closer To The Woman Who Broke Up His Marriage."

The original complaint also named six distributors of the National Insider as parties defendant, one of whom was a citizen of New York and one a citizen of California. In the original complaint plaintiffs alleged that they were New York residents and in an amended complaint that they were California residents.

The defendants moved for judgment on the pleadings or, in the alternative, for a summary judgment. On November 29, 1973, the district court granted the motion for summary judgment for the reasons that "this Court believes that the plaintiffs cannot prove actual malice in the *Times* sense" and "the plaintiffs must allege and prove 'special damages.'"

On appeal to this court, we vacated the judgment because of absence of complete diversity and remanded to "allow amendments to cure the jurisdictional defects." 511 F.2d 22 (7th Cir. 1975).

Upon remand the non-diverse defendants, and later all of the distributor defendants, were voluntarily dismissed from the suit pursuant to Fed.R.Civ.P. 41(a)(2). The remaining two defendants then moved for re-entry of summary judgment or in lieu thereof for judgment on the pleadings. On July 22, 1975, the district court re-entered its November 29, 1973 order granting summary judgment to the defendants.

The plaintiffs have appealed and seek to have the summary judgment reversed so that the cause of action may proceed on the merits.

The defendants seek to support the district court judgment on the ground that their article was based upon the facts contained in a newspaper story written by Bruce Vilanch and contained in the February 28, 1972 edition of *Chicago Today*, a former daily newspaper published in Chicago. They contend that "actual malice" is lacking because they believed that Vilanch's article was true.

II

The basic *New York Times* rule provides that the First and Fourteenth Amendments prohibit a public official from recovering damages in a civil libel action for a defamatory falsehood relat-

ing to his official conduct unless he proves that the statement was made with actual malice—that is, with knowledge that it was false or reckless disregard of whether it was false or not.[1]

The rule applies also to public figures—those who command a substantial amount of independent public interest at the time of the publication of the defamatory statements, attained through position alone or through purposeful activity amounting to a thrusting of one's personality into the vortex of an important public controversy.[2] Some persons occupy positions of such pervasive power and influence that they are deemed public figures for all purposes and in all contexts. Other persons thrust or inject themselves to the forefront of particular public controversies, inviting attention and comment, or are drawn into public controversies. Contrary to the all-purpose public figure, those latter persons become public figures for a limited range of issues or for a limited time.[3] Nevertheless, both the all-purpose and the part-time public figures are governed, in the case of prosecuting libel actions, by the *New York Times* rule.

At common law, actual malice was shown by ill will, evil or corrupt motive, intention to injure, hatred, enmity, hostility, or spite. Except for requiring that it be shown with convincing clarity, *New York Times* did not define "actual malice" beyond saying that it was "with knowledge that . . . [the defamatory falsehood] was false or

with reckless disregard of whether it was false or not."[4] Later cases have defined it as making statements with a high degree of awareness of their probable falsity,[5] or where the defendant entertained serious doubts as to the truth of the statements.[6]

"Actual malice" has become a term of art to provide a convenient shorthand for the *New York Times* standard of liability. It is quite different from the common law standard of "malice" generally required under the state tort law to support an award of punitive damages. Whereas the common law standard focuses on the defendant's attitude toward the plaintiff, "actual malice" concentrates on the defendant's attitude toward the truth or falsity of the material published.[7]

Examples of reckless disregard expressly given by the Supreme Court include where a story is fabricated by the defendant, is the product of his imagination, is based wholly upon an unverified anonymous telephone call, or where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.[8]

### III

The plaintiffs admit that they are both "public figures."[9] The amended complaint alleges that plaintiff Carson "has been an entertainer and has earned his livelihood as such primarily in the television industry" and that he "enjoyed an excellent name and reputation both

1. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

2. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 154–55, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (Mr. Justice Harlan's plurality opinion).

3. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

4. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

5. *Garrison v. State of Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

6. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

7. *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 251–52, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974).

8. *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

9. Plaintiffs' brief describes Carson as "a preeminent entertainer and show business personality" (p. 2). Their reply brief directly states that "Johnny Carson and Joanna Holland are public figures . . ." (p. 2).

internationally and throughout the United States as being one of the more popular and outstanding practitioners of his profession." Carson is an all-purpose public figure.

■ The other plaintiff, Joanna Holland, subsequent to the filing of this action was married to Carson (A. 226, 288). The record contains copies of many media articles relating to Carson's former wife (A. 404–50). From these, as well as from the National Insider and Vilanch articles, one can assume that the wife of a public figure such as Carson more or less automatically becomes at least a part-time public figure herself.

The district court found that "both Mr. Carson and Miss Holland fall readily within the term 'public figure.'" Therefore, both plaintiffs are subject to the application of the *New York Times* rule.

### IV

In cases such as this where the *New York Times* rule is applicable, the Supreme Court has required that an appellate court make an independent examination of the whole record to determine whether it could constitutionally support a judgment for the plaintiff "so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression."[10] Judge J. Skelly Wright in a concurring opinion[11] applied the record-examination requirement to a summary judgment situation as follows:

> In my judgment *New York times Co. v. Sullivan* makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the *Times* test of actual knowledge or reckless disregard of the truth. . . . Unless the court finds, on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it

should grant summary judgment for the defendant.

■ We have examined the whole record as it now exists and find as follows:

The Vilanch (*Chicago Today*) article was headed "Why Carson is Moving West" and speculated on the reasons why the Tonight Show was moving from New York City to Hollywood, California. The article gave Carson's reasons as "the talent pool is out here now" and "a move will give the staff 'a shot in the arm.'" The article gave the National Broadcasting Company's reasons that Carson's ratings "really skyrocketed when he makes one of his frequent three-week sallies to Hollywood" and "[t]he California combination of movie stars, Vegas comics, starlets and professional weirds outdraws the Manhattan collection of stage actors, night club performers and visiting European film stars." The reasons given by other networks were that their competition against the Tonight Show was strengthening and NBC desire to take some move to ward off that competition.

Vilanch then speculated upon another reason, prefacing his remarks with "it's said." He stated that "Carson has been seeing the Bel-Air divorcee [Holland] . . . ." and "Ms. Holland's home is Los Angeles. . . ." He then concluded, apparently on the sole ground that Holland resided in California, that "she is the woman who has launched a thousand ships westward as Johnny Carson moves his entire Tonight Show from New York to Hollywood."

However, even after reaching that conclusion, Vilanch somewhat softened the stigma of blaming Holland for the move by also pointing out that Carson's sons by his previous marriage resided in California and that New York was "too removed from . . . his loved ones." Finally, he added that Carson has a

---

10. *New York Times Co. v. Sullivan*, 376 U.S. 254, 284–85, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964).

11. *Wasserman v. Time, Inc.*, 138 U.S.App.D.C. 7, 424 F.2d 920, 922–23 (1970).

home in Las Vegas which "sees very little activity most of the year." The total impact of the Vilanch article was that there were many reasons for moving the Tonight Show and Holland being in California was one of those reasons.

The fact was, however, that Holland did not live in California.

Carson had been divorced from his former wife on September 5, 1972 and married Holland on September 30, 1972 (A. 156, 226, 288).

Holland testified that she was born in New York City and lived there all her life up to September 4, 1972, when she moved to California (A. 214). The first time she ever visited California was in May 1971 (A. 289). One of the editors for the defendants testified on deposition that after the present action had been filed he made some investigation of the facts and "from our investigation, . . . the fact that Miss Holland was from Bel-Air, California, was an error in fact" and "I was advised by our attorney that it appeared to be an error in fact" (A. 351).

The National Insider article emphasized and built up the supposed fact that Holland was in California while Carson was in New York, stated that this was "the only real reason" for moving the show, and that the other reasons given by Vilanch were merely for public consumption to hide the "real reason." The article then proceeded to picture Carson in a gigantic struggle between giving up Holland and staying on his New York-based show or giving up the show to fly to Holland in California. According to the article, the dilemma was solved by Carson suggesting moving the show to where Holland purportedly resided, since "greedy character that he is, he couldn't see giving up making all those dollars for love." NBC gave in to "Carson's brash demands."

What developed to be the one clearly false fact in the Vilanch article—that is,

Holland's place of residence—became the whole theme of the National Insider article. What had been a subdued, relatively non-defamatory use of the fact by Vilanch was magnified by the defendants into a highly defamatory and inflammatory diatribe squarely fixing the blame on Holland for uprooting the entire cast and staff of the Tonight Show at a cost of millions of dollars to NBC in order to remove the "impediment . . . in their continuing affair" and so that Carson would not be forced to return after each night's show to "an empty bed."

In addition, the author of the article admitted on deposition that the Vilanch article gave him no basis to conclude that Carson was "a greedy character" or that his professional performance was impaired if he returned to "an empty bed" (A. 206).

The Vilanch article appeared on February 28, 1972, and the National Insider article on April 9, 1972, almost six weeks later. The "facts" allegedly relied on by the defendants from the Vilanch article were not "hot news."[12] The defendants were not bedeviled by an early deadline. They had ample time to investigate whether the keystone fact in their story —Holland's residence—was true. They were also aware as publishers that the substance of the defamatory statements they were publishing made "substantial danger to reputation apparent."[13] Although a substantial argument can be made that the failure to verify Holland's place of residence when that fact was the linchpin for a series of defamations justifies permitting a fact-finder to determine whether actual malice existed, we need not decide that issue because there are two other reasons why a jury should decide whether the defendants acted with actual malice.

In addition to the major theme of the National Insider article that Holland's

12. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

13. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), citing *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

supposed California residence caused the expensive moving of the Tonight Show, the article contained a secondary recurring theme that Holland had broken up Carson's prior marriage.

Both Carson (A. 288) and Holland (A. 227) testified in depositions that they first met on October 16, 1970. Carson further testified that he separated from his former wife in May 1970 (A. 287), five months before he first met Holland (A. 237). His former wife testified upon deposition that the separation occurred in June 1970 (A. 295), at least four months prior to the Carson-Holland relation. The Vilanch article correctly reported that "Carson has been seeing . . . [Holland] since shortly after he split from his second wife. . . ."

The National Insider article included the following statements:

(1) "Johnny Carson is moving his show . . . so he can be closer to the woman who broke up his marriage."

(2) ". . . [Holland] has been in the background of Carson's hectic life for the past several years." The article was published on April 9, 1972, about a year and a half after the first Carson-Holland meeting.

(3) "After the Carsons split, Johnny began dating Joanna Holland openly."

(4) "HE TRIED to make people believe he had met her AFTER the split with his wife—but those in the know winked at each other, and laughed up their sleeves."

The headline for the article is "Johnny Carson Is Moving 'Tonight Show' To Hollywood So He Could Be Closer To The Woman Who Broke Up His Marriage." The headline and the above portions of the National Insider article are not only false but are directly contradicted by the Vilanch article, which the defendants relied upon for the veracity of their own article.

Evan Crawley, the author of the article, testified on deposition as follows (A. 206):

[Q.] Would you indicate to me those portions of the [Vilanch] article from which you drew support for the statement that Joanna Holland is the woman who broke up his marriage?

. . . A. I didn't get that from this article.

Q. Where did you get that?

A. Somewhere in the research file.

Nothing in the present record, which consists of the pleadings, depositions and affidavits, lends any support whatsoever, or even relates to, the published statements alleging or implying that Holland broke up Carson's prior marriage. At this stage of the proceedings, it can only be concluded that those statements are a sheer fabrication by the defendants, which *St. Amant* poses as an express example of actual malice.[14]

As part of the major theme of the National Insider article that Holland's alleged California residence caused the moving of the Tonight Show, the article developed in copious detail the supposed struggle between Carson and the NBC executives wherein Carson was seeking to move the show and NBC was resisting the move. The article contains supposed quotations by Carson to the executives and their responses and reactions.

Carson testified on deposition that he personally had no conversations with NBC executives regarding the westward move (A. 263).

The author of the National Insider article testified on deposition as follows (A. 207):

Q. My question is: From what information, inference and/or implication in the Bruce Vilanch story you drew the graphic description of the Carson conversation with N.B.C. executives, to-wit: Where you indicate Carson's patient interruptions have flabbergasted N.B.C. executives?

A. Well, as I recall, it seemed to be simply a logical extension of what must have gone on from the facts that I read from the Bruce Vilanch article.

14. *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

In the catalogue of responsibilities of journalists, right next to plagiarism, which parts of the National Insider article seem to be, must be a canon that a journalist does not invent quotations and attribute them to actual persons. If a writer can sit down in the quiet of his cubicle and create conversations as "a logical extension of what must have gone on" and dispense this as news, it is difficult to perceive what First Amendment protection such fiction can claim. In any event, *St. Amant* expressly gives as another example of reckless disregard for the truth any "product of [one's] imagination." 390 U.S. at 732, 88 S.Ct. 1323.

Because of both the completely fabricated marriage-breaker accusations and the wholly imagined but supposedly precisely quoted conversations regarding the purported struggle preceding the westward move of the Tonight Show, the plaintiffs are entitled to a jury's determination of whether actual malice existed.

We believe that the district court could only find on the basis of pretrial affidavits, depositions and other documentary evidence that the plaintiffs will be able to prove actual malice and that they should therefore be given the opportunity to do so.[15] The defendants in fabricating and imagining "facts" necessarily entertained serious doubts as to the truth of the statements[16] and had a high degree of awareness of their probable falsity.[17]

This case is similar to *Guam Federation of Teachers v. Ysrael*, 492 F.2d 438, 49 (9th Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974), where the Ninth Circuit held that the plaintiffs had enough proof of actual malice to get to the jury where the author of the allegedly libelous article testified as follows:

> He repeatedly admitted that he did not know whether what he said was true. He repeatedly admitted that he did nothing, or almost nothing, to verify his charges. As to most of his statements, he repeatedly admitted that he knew no facts to support them; he either relied upon unspecified rumor or upon nothing at all. He simply asserted that he believed that what he said was true. Such an assertion is not enough  .  . . .

Also pertinent is the following from *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969):

> Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable  .  . . .
> Furthermore, in our case, Ginzburg added certain innuendoes to some quoted statements and quoted other statements out of context in order to support his predetermined result. One cannot fairly argue his good faith or avoid liability by claiming that he is relying on the reports of another if the latter's statements or observations are altered or taken out of context.

The affidavits filed by the operating officer and an editor of the defendants stating that they believed that their article was true (A. 366–68) and the affidavit of the author that he "entertained no malice against" Carson or Holland (A. 369–70), are of no value in view of the other facts in the record.

---

15. *Wasserman v. Time, Inc.*, 138 U.S.App.D.C. 7, 424 F.2d 920, 922–23 (1970); *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858, 864–65 (5th Cir. 1970). Inasmuch as *all* the evidence in the record in the present case so far shows that the defendants fabricated and imagined substantial portions of the subject article, we need not go into the question of whether the trial judge can make credibility determinations or draw his own inferences, or whether the losing party upon a summary judgment adjudication is entitled that every favorable inference be drawn in his favor and credibility judgments be construed to his benefit. *See Guam Federation of Teachers v. Ysrael*, 494 F.2d 438 (9th Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974); *Alioto v. Cowles Communications, Inc.*, 519 F.2d 777 (9th Cir. 1975).

16. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

17. *Garrison v. State of Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

As Mr. Justice White said for the Court in *St. Amant*, "[p]rofessions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, [or] is the product of his imagination . . . ." [18] Whether the defendants entertained malice toward the plaintiffs is immaterial since "actual malice" in the *New York Times* sense refers to the defendants' attitude toward the truth or falsity of the material published.[19]

## V

The defendants seek to rely upon *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), to sustain the district court's conclusion that "special damages" must be shown. In addition to requiring that a standard of care of negligence or higher be applied when resolving the libel claims of *private individuals*, the Supreme Court in *Gertz* held that in such cases there shall be no recovery of presumed or punitive damages. However, Mr. Justice Powell added for the Court "at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." 418 U.S. at 349, 94 S.Ct. at 3011. The fairly clear implication is that where actual malice as defined in *New York Times* is shown, presumed and punitive damages are recoverable [20] if the applicable state law permits such damages,[21] and hence special damages need not be shown.[22]

We therefore reverse the summary judgment entered in favor of the defendants and remand the cause for further proceedings.

---

**18.** *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968).

**19.** *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 251–52, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974).

**20.** *Goldwater v. Ginzburg*, 414 F.2d 324, 340–41 (2d Cir. 1969); *Davis v. Schuchat*, 166 U.S. App.D.C. 35, 510 F.2d 731, 737–38 (1975).

**21.** Under Illinois law, special damages need not be shown in cases of libel *per se*; libel *per se* is equated with slander *per se*, which includes imputations of unchastity to a woman and statements detrimental to one's employment, profession or trade. *Coursey v. Greater Niles Township Pub. Co.*, 82 Ill.App.2d 76, 227 N.E.2d 164 (1967), *aff'd* 40 Ill.2d 257, 239 N.E.2d 837 (1968); *Whitby v. Associates Discount Corp.*, 59 Ill.App.2d 337, 207 N.E.2d 482 (1965).

**22.** The district court in this case relied upon *Continental Nut Co. v. Robert L. Berner Co.*, 345 F.2d 395, 397 (7th Cir. 1965), but that case involved libel *per quod*.