856 F.2d 1046
 47 Fair Empl.Prac.Cas. 1290,
47 Empl. Prac. Dec. P 38,255,
3 Indiv.Empl.Rts.Cas. 1303
Gerald A. BURGER, Appellant,
Helen L. Burger,
v.
McGILLEY MEMORIAL CHAPELS, INC., and McGilley Memorial
Chapels, and U.F.S.I.- McGilley, Inc., and Forest
Park-McGilley, Inc., and United Funeral Services, Inc., and
Forest Park Memorials, Inc., Appellees.
 No. 87-1160.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 15, 1988.
Decided Sept. 1, 1988.
Rehearing Denied Oct. 20, 1988.
 
 John M. Lilla, Lindsay K. McFerrin, Jackson & Bailey, P.C., Kansas City, Mo., for appellant.
 Fred Wilkins, Kansas City, Mo., for appellees.
 Before LAY, Chief Judge, FAGG, Circuit Judge, and DOTY,* District Judge.
 LAY, Chief Judge.
 
 
 1
 Gerald A. Burger, age 57, brought suit against his former employer, McGilley Memorial Chapels, seeking compensation and liquidated damages for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. Secs. 623, 626(d)(1), 630(b) and 631 (1982). (ADEA) He also brought a state pendent claim for slander. Before his discharge Burger had worked as an embalmer for twenty-three and one-half years with the defendant. A jury returned a verdict against him on the ADEA claim but awarded $1.00 in nominal damages and $85,000 in punitive damages on the slander claim. The trial court, the Honorable Howard F. Sachs presiding, granted a judgment n.o.v. on the punitive award. Burger now appeals.
 
 
 2
 Burger's suit stems from his discharge. Sometime during the year following his discharge in 1983, James McGilley, III, told a prospective employer of Burger's that the latter had been fired for working for a competitor while on duty at McGilley's funeral parlor. This statement formed the basis of Burger's claim of slander.
 
 
 3
 On appeal, Burger asserts that: (1) despite the jury's findings to the contrary, he had established a violation of age discrimination under the ADEA; (2) the district court should have granted a new trial because of an erroneous jury instruction on the ADEA claim; and (3) the district court erred in granting a judgment n.o.v. on the jury's punitive damages award for slander. We affirm in part and reverse in part.
 
 I. ADEA CLAIM
 
 4
 In the instant case, Burger asserts he has proved as a matter of law that the defendants' reason for firing him was merely a pretext and, thereby, the district court erred in not granting judgment n.o.v. on that claim. In support of his claim, Burger asserts that the answers to questions 4, 5, and 6 of the Special Verdict,[1] conclusively demonstrate the pretextual nature of the defendants' reason for firing, despite the fact that the jury directly found in its answers to questions 2 and 3 that age was not a factor in firing Burger. This apparent inconsistency may be resolved by closer examination of the Special Verdict. Questions 4, 5, and 6 may be read as concerning the count of slander, not the ADEA claim. In question 6, specifically, the jury was asked about McGilley's beliefs at the time he made the statement to Burger's prospective employer. Thus, the question does not directly address Burger's assertion of McGilley's beliefs at the time Burger was fired; that question was answered directly by the jury's finding that age was not a factor in terminating Burger. Assuming that he did prove that McGilleys' asserted basis for termination was false, the jury verdict may be read as showing that Burger still failed to prove that there was a discriminatory intent for the termination. In other words, the verdict form must be read to mean that the jury found Burger did not sustain his ultimate burden of proving that age was the motivating factor for the discharge. The finding of discriminatory intent is for the trier of fact, in this case the jury. Cf. Pullman-Standard v. Swint, 456 U.S. 273, 289-90, 102 S.Ct. 1781, 1790-91, 72 L.Ed.2d 66 (1982). When a pretextual reason for discharge is found, the jury must still find that the pretext was to cover a discriminatory reason. Pollard v. Rea Magnet Wire Co., Inc., 824 F.2d 557, 559-60 (7th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). In this case the jury found that age discrimination was not proven. We find no error here. See Barber v. American Airlines, Inc., 791 F.2d 658 (8th Cir.1986), cert. denied, 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986).
 
 Liquidated Damages
 
 5
 In conjunction with the ADEA claim, Burger also cites as error the fact that the district court did not give an instruction on liquidated damages. Liquidated damages are double damages, punitive in nature, which are available under 29 U.S.C. Sec. 626(b) for "willful violations" of the ADEA. Under the two-tiered approach to liability for age discrimination, a violation is "willful" if " 'the employer ... knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.' " Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) (quoting Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc., 713 F.2d 940, 956 (2d Cir.1983)).
 
 
 6
 In view of the fact that the jury found that plaintiff failed to prove discriminatory intent under the ADEA, the issue on appeal as to the submission of liquidated damages is no longer relevant.[2]
 
 II. SLANDER
 
 7
 After Burger's discharge he sought employment with other funeral homes. The liability finding of the jury on the slander count as affirmed by the district court is not challenged on appeal. Burger's slander suit is based on the alleged false statement of James McGilley III to Burger's prospective employer, an owner of a competitive funeral parlor (Newcomer) that Burger had been working for others "while on our clock."
 
 
 8
 Burger now appeals the district court's grant of the defendants' motion for judgment n.o.v., which denied him recovery of punitive damages for the slander. The district court did allow, however, the award of nominal damages for slander to remain intact. In delineating the reasons for denying punitive damages the district court concluded "that only speculation and conjecture could support the jury's response to question 6 * * *." Memorandum and Order Denying Plaintiffs' Motions and Granting Defendants' Motion for Judgment Notwithstanding the Verdict at 2, Appendix at 289.[3] The district court also based its decision on the fact that it had not instructed the jury that question six must be established by clear and convincing evidence.
 
 
 9
 It is well settled in this circuit that "[i]n passing upon a motion ... notwithstanding the verdict, the standard to be applied by the District Court and by this Court is the same." Cleverly v. Western Elec. Co., 594 F.2d 638, 641 (8th Cir.1979). Under the standard:
 
 
 10
 [t]he evidence, together with all reasonable inferences to be drawn therefrom, must be considered in the light most favorable to the plaintiff, as the party prevailing with the jury. Cleverly v. Western Electric Co., 594 F.2d 638, 641 (8th Cir.1979) (Cleverly ). The court may not weigh the evidence or assess the credibility of witnesses. Merrill Lynch, Pierce, Fenner & Smith v. First National Bank, 774 F.2d 909 (8th Cir.1985). The motion must be denied if, reviewing the evidence in this light, reasonable persons could differ as to the conclusions to be drawn from it. Cleverly, 594 F.2d at 641. In other words, a motion for JNOV may be granted only when all the evidence points one way and is susceptible of no reasonable inferences sustaining the jury's verdict.
 
 
 11
 Floyd v. Kellogg Sales Co., 841 F.2d 226, 228 (8th Cir.1988).
 
 
 12
 Based on the above standard of review, we must respectfully disagree with the district court in its vacation of the verdict for punitive damages. We find that there was clear and convincing evidence to sustain the jury's verdict of malice.
 
 
 13
 The United States Supreme Court has held that a statement was made with actual malice if it was made "with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). The Missouri standard for actual malice is based on the New York Times test. McDowell, 747 S.W.2d at 632.[4] In the instant case, Burger asserted (1) that Jim McGilley, III, made the statement to a prospective employer knowing it to be false, and (2) that he made the statement with reckless disregard for whether it was true or false.
 
 
 14
 At the time Burger was hired, the funeral parlors were managed by James P. McGilley, Sr., and his sons John and James McGilley, Jr. After their father's death, James McGilley, Jr. and John became co-owner of the funeral parlors. Two of the sons of James McGilley, Jr., James P. McGilley, III, and Mark McGilley, worked at the business and eventually rose to management positions directly beneath James McGilley, Jr., and John McGilley. On January 26, 1983, the business was sold to a partnership composed of two Texas corporations. James McGilley, Jr., and John McGilley retained no ownership of the business, but James McGilley, III, and Mark McGilley were placed in charge. Twelve days later Burger was fired by James McGilley, III, and Mark McGilley. Based upon Burger's testimony of that firing, which provides the most favorable inferences to his case, Burger was given no reason at that time for being fired. The only statements the McGilleys made to Burger were to the effect that Burger knew why he was being fired. Burger's testimony reflects that Jim McGilley III stated "We are going to ask you to resign or you are going to get fired. If you don't resign, things are going to get pretty hairy. * * * Furthermore, if you don't resign, you will probably never get another job in Kansas City." Transcript of Proceedings at 211. (Our emphasis). Burger refused to resign.
 
 
 15
 The evidence is undisputed that Burger had done embalming work for other funeral homes during his off duty hours. He had received permission to do this from McGilley Jr. and had done this for several years without objection. A note written by McGilley, Jr., in the mid nineteen-sixties[5] praises Burger and states that his shift would be changed from day to night. Burger states that the reason for the change was to allow him to make more money by working at other funeral homes during the day time. The general tenor of the note supports Burger's version.[6]
 
 
 16
 The defendants asserted at trial that the reason Burger was discharged was a belief that Burger was working for other funeral homes during on duty time. This reason was the same reason told Newcomer when Burger was looking for new employment. If the statement was true or if McGilley made it believing it to be true Burger's claim of malice must fail. Burger asserted the reason was not only false but the reason was conceived after the fact either as a pretext for age discrimination or as a defense to the slander charge. Burger's proof at trial showed that this was not the documented reason for discharge that the McGilleys had asserted shortly after his discharge. The asserted basis at trial for McGilleys' belief was an alleged statement by David Flagor. Flagor was a student embalmer who had sometimes worked with Burger. Flagor testified that on one occasion in December of 1982 that Burger had left the premises while on duty to do work for the Gibson-Butler funeral home and specifically asked Flagor to cover for him.[7] McGilleys' defense, accepted by the district court, is that even if Burger did not do what Flagor stated, that they had a right to rely on Flagor's statement. Therefore, it is argued since they did not know Flagor's statement was false, the McGilley brothers did not act out of malice. We find the evidence, however, supports Burger's theory that the McGilleys either knew the statement was false or that they acted out of reckless disregard as to its truthfulness when they told plaintiff's prospective employer that Burger had been disloyal by working for competitors during on duty hours. Burger's evidence established irrefutably that Flagor's testimony was not only false, but provided by clear and convincing proof, a basis for the jury to find that the McGilleys concocted the whole story after the discharge. If Burger's evidence is believed, he clearly established a basis for the jury to find that the defendants acted out of malice in trying to prevent Burger from getting another job with a competitor.
 
 
 17
 The record refutes the verity of Flagor's statement. The only specific instance Flagor could recall of Burger doing work for Gibson-Butler on duty supposedly occurred in December 1982. Burger produced his schedule of work for that month, which was corroborated by another student embalmer, David Czaplinski. Burger also produced his own catalogue of all of the remains he had embalmed in 1982 and the dates and times of death of each. Based on these records (as verified, according to Burger, by Gibson-Butler records) the only possible time when Burger could have left the McGilley mortuary to embalm remains at Gibson-Butler was December 16, 1982. This information was supported by a meticulous mileage record kept by Burger for income tax purposes that indicated each place Burger drove.
 
 
 18
 Czaplinski examined Burger's work schedule and stated that he, not Flagor, worked with Burger all of December, except for December 12 and 23. Flagor did not dispute Czaplinski's statement. Czaplinski, Doug Smith, and Wade Vogel, all of whom worked for Burger as student embalmers at various times, testified that they knew of no instance when Burger left without permission while on duty to work at another funeral parlor. Burger testified he had left McGilleys without permission only on one occasion in twenty three and one half years and that had been a family emergency. This evidence, if believed, totally discredited Flagor's statement allegedly provided to the McGilley brothers. Plaintiff's evidence, if believed, also convincingly discredited the McGilleys' defense that their statement to Newcomer, the prospective employer, was true. They told Newcomer that Burger was fired because he had worked for other funeral homes while on duty at the McGilley funeral home. Jim McGilley, III, stated in his deposition that he told Newcomer that "other than that Gerald had been a fine employee."[8] (Our emphasis). Yet the record is undisputed that McGilleys did not reveal this reason for Burger's discharge to his own superior in Texas or to the Missouri Division of Employment Security shortly after Burger's discharge.
 
 
 19
 Burger submitted letters written by James McGilley, III, to his supervisor in Texas and to the Missouri Division of Employment Security which purportedly stated the reasons for Burger's termination. None of those letters stated that Burger was fired because he left to work for others while on duty at the McGilley mortuary.[9] These letters provided the jury a clear and convincing inference that the reason Burger was fired was not based upon the alleged statement of Flagor that Burger was working for others during on duty time.
 
 
 20
 There was much evidence presented from which the jury could clearly conclude that the McGilleys possessed such spite and ill will toward Burger that they were looking for an excuse to fire him and in addition prevent him from getting a job with any other competitor. The jury had sufficient evidence to infer that the excuse for firing him was later conceived by the defendants to protect them from the charge of defamation by reason of the statement to Newcomer. Both Flagor and another student embalmer Bastion testified that Burger had worked for other funeral homes during on duty time. Their credibility was severely challenged and the jurors' answer to the special verdict demonstrated that they were not believed. In contrast, Czaplinski, another student embalmer, testified that Mark McGilley approached him on February 9, 1983, just two days after Burger was fired, and tried to coerce Czaplinski. Czaplinski's testimony stated:
 
 
 21
 A. Well, [Mark] pulled me back to the vestibule and he said, ... "We have reason to believe that Gerald is going to sue us. That means you will be called to testify."
 
 
 22
 * * *
 
 
 23
 * * *Q. Did he say anything else at that time?
 
 
 24
 A. Yes, he did. He went on to say about how McGilley was a very influential firm and they were powerful and being that I was going to be called to testify, that if I said what he wanted me to say, he would make things good for me and see that I got a job elsewhere, for example, like Houston, Corpus Christi, and so forth.
 
 
 25
 Q. To make sure I have got your testimony correctly, he said something about McGilley being an influential and powerful firm?
 
 
 26
 A. Correct.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 Q. When he said to you that if you said what he wanted you to say, he could make things good for you, what did you take that to mean, "If you say what I want you to say"? Did you think he was referring to your testimony at the trial?
 
 
 30
 A. Yes, I did.
 
 
 31
 Q. When he said he could make things tough for you, what did you take that to mean?
 
 
 32
 A. If I didn't say what he wanted me to say, he was going to blackball me, so to speak.
 
 
 33
 Transcript of Proceedings at 1080-81. The jury could have considered the attempt to intimidate Czaplinski as evidence of malice toward Burger.
 
 
 34
 There was also other evidence of malice. Just after Burger was discharged, James McGilley, III, suggested to Mark McGilley that Mark call Acme Livery Service and tell them that Burger could not come onto McGilley property. They knew that Burger worked for Acme as a funeral driver while he was off duty. Thus, they were also limiting his income outside of his embalming work for the McGilleys. The jury was entitled to reject McGilleys' proferred reason for this action (that to do so would save Burger embarrassment).
 
 
 35
 James McGilley, Jr., Mark McGilley, and James McGilley, III, used the exact same word to describe Burger's work for them, "adequate." Yet neither Mark McGilley nor James McGilley, III, was a licensed embalmer himself. Czaplinski testified that Burger was very good at embalming. Czaplinski is a licensed embalmer who worked under Burger while a student. Moreover, McGilley III admitted he told Newcomer that Burger was a fine employee except for his disloyalty in working for another competitor during on duty hours. The jury was entitled to believe that Burger was a good embalmer and that the reason the McGilleys told Newcomer for Burger's discharge was false.
 
 
 36
 The defense argues that they relied on Flagor's statement and even if false they acted in good faith belief that it was true. The jury rejected this defense. We find, alternatively, that the circumstances surrounding Flagor's statement were such that the jury could find that McGilleys did not in good faith rely on the truthfulness of the statement. Burger was not confronted with the statement nor did McGilley attempt to make a simple check of available records to verify it. Although failure to investigate may not alone support a finding of malice, it is a fact to be considered, along with all the other circumstances pointing to a reckless disregard of Burger's rights.
 
 
 37
 The Supreme Court of the United States delineated the "reckless disregard" standard in St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). The Court said there, " 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication ..." Id. at 730, 88 S.Ct. at 1325. The court added:
 
 
 38
 The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.
 
 
 39
 Id. at 732, 88 S.Ct. at 1326 (footnote omitted).
 
 
 40
 The fundamental test is whether there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." 390 U.S. at 731, 88 S.Ct. at 1325. The jury may infer that the defendant published the defamatory statement with knowledge or reckless disregard of the statements falsity. See Curtis Publishing Co. v. Butts, 388 U.S. 130, 157, 87 S.Ct. 1975, 1992-93, 18 L.Ed.2d 1094 (1967), reh'g denied, 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967) (jury finding of malice upheld where the evidence disclosed "serious deficiencies in investigating procedure" in a situation where the story was not "hot news"); Goldwater v. Ginzburg, 414 F.2d 324, 336-37, 342 (2d Cir.1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970), reh'g denied, 397 U.S. 978, 90 S.Ct. 1085, 25 L.Ed.2d 274 (1970) (jury finding of malice upheld where sources cited in magazine story were distorted and presented so as to misrepresent the facts); Miller v. Lear Siegler, Inc., 525 F.Supp. 46, 61-62 (D.Kan.1981) (jury inference of malice upheld where totality of circumstances showed that defendants' publication of press release defaming plaintiff was done for the purpose of making plaintiff a scapegoat).
 
 
 41
 Failure to investigate is an important factor in making the inference of the publisher's malice. Brown v. Skaggs-Albertson's Properties, Inc., 563 F.2d 983, 987 (10th Cir.1977). ("Malice may be inferred in the situation where the defendant has no reasonable basis for believing that the statement is true. This would be the case where there had been a failure to make an adequate investigation.") The Seventh Circuit has observed proof of malice is adequate to submit to a jury where
 
 
 42
 [The defendant] repeatedly admitted that he did not know whether what he said was true. He repeatedly admitted that he did nothing, or almost nothing, to verify his charges. As to most of his statements, he repeatedly admitted that he knew no facts to support them; he either relied upon unspecified rumor or upon nothing at all. He simply asserted that he believed that what he said was true. Such an assertion is not enough....
 
 
 43
 Carson v. Allied News Co., 529 F.2d 206, 213 (7th Cir.1976) (citing Guam Fed'n of Teachers, Local 1581, American Fed'n of Teachers v. Ysrael, 492 F.2d 438, 439 (9th Cir.1974), cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974)). (The Carson Court found that evidence that topic of defamatory story was not "hot news" and no investigation of the facts had been undertaken, was sufficient showing to permit jury to make a determination of actual malice). See also Grossman v. Goemans, 631 F.Supp. 972, 974 (D.D.C.1986) (Punitive damages warranted where failure to investigate was accompanied by evidence of malicious motive for publishing the defamatory statement). Accord Fopay v. Noveroske, 31 Ill.App.3d 182, 334 N.E.2d 79, 88 (1975). The Missouri Court of Appeals itself has considered the failure to further investigate facts in the context of reckless disregard for the truth. Cf. Williams v. Pulitzer Broadcasting Co., 706 S.W.2d 508, 512 (Mo.Ct.App.1986) (failure to investigate did not sustain a punitive damages award where the evidence showed no obvious reason to doubt the veracity of the informant).
 
 
 44
 The jury could clearly find that (1) Burger was not confronted nor told the correct reason for his discharge, (2) Burger's work for other funeral homes when he was off duty was done with the McGilleys' knowledge and consent, (3) he was not told he was violating company policies by working for other funeral homes while off duty, (4) Burger was threatened that he would be black balled from other work if he did not resign, (5) letters written regarding the discharge did not reveal the same reason for Burger's firing as was given to Newcomer, (6) the reason given to Newcomer was false, (7) Flagor's alleged statement could have been easily verified from records McGilleys maintained, (8) Flagor's statement was in fact false, (9) another student embalmer had been threatened that if he did not testify the way McGilley wanted him to it would affect his employment and (10) McGilleys had attempted to act punitively against Burger as to his other employment. All of these factors, when giving the plaintiff the benefit of the favorable inference findings provide clear and convincing proof that the defendants made the defamatory statement with the knowledge that it was false, or with reckless disregard for whether it was false, and that the defendants acted with malicious motives.[10]
 
 III. CONCLUSION
 
 45
 The jury verdict and judgment denying the ADEA claim are hereby affirmed. The district court's grant of judgment n.o.v. on the issue of punitive damages for slander is hereby reversed, and the cause is remanded with directions to enter a judgment on the verdict.
 
 IV. ASSESSMENT OF COSTS
 
 46
 The district court did not assess costs to either party. We therefore reverse and order that the plaintiff be awarded seventy-five percent of his costs. The same apportionment of costs are ordered on the appeal.
 
 
 
 *
 The HONORABLE DAVID S. DOTY, United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The first special verdict states:
 SPECIAL VERDICT
 
 
 [1]
 How much money, if any, did plaintiff Burger lose because he was discharged?
 $58,608.41
 
 
 [2]
 Has plaintiff established that Mr. Burger's age was a factor motivating his discharge?
 Yes No X
 
 
 [3]
 Has defendant McGilley established that it would have discharged Mr. Burger regardless of his age?
 Yes X No
 
 
 [4]
 Except for the incident at his house in September 1982, has plaintiff established that Mr. Burger did not leave McGilley's premises during working hours without permission?
 Yes X No
 
 
 [5]
 Has plaintiff established that he did not work for others during his hours of scheduled work for McGilley?
 Yes X No
 
 
 [6]
 Has plaintiff established that James McGilley III did not believe or had a serious doubt about the truth of his statement when he told Mr. Newcomer that Mr. Burger had been working for others "while on our clock?"
 Yes X No
 
 
 [7]
 Has plaintiff established that, as of January 26, 1983 (twelve (12) days before the termination), Mark McGilley intended to discharge Mr. Burger?
 Yes No X
 
 
 [8]
 Has plaintiff established that he took some action or failed to take some action as a result of the statement by Mr. Morrow on January 26, 1983, so that his conduct was affected by the statement?
 Yes X No
 Appendix at 223.
 
 
 [2]
 At conference concerning jury instructions the district court held that the issue of damages, both liquidated damages on the age discrimination count as well as punitive damages on the age discrimination count as well as punitive damages for slander, could be reserved until the jury answered the first set of Special Questions. The district court did not foreclose the giving of the requested instructions, but stated: "We can deal with that in two stages. I think that [the liquidated damages issue] is susceptible to being used with the punitive damage issue. I don't think we need a further instructions conference before we proceed with this stage of the submission * * *." Transcript at 1342. Once the age discrimination claim was rejected by the jury there was no further effort by plaintiff to submit the issue of liquidated damages
 
 
 [3]
 See first special verdict, supra note 1
 
 
 [4]
 Since the alleged defamatory conversation complained of was an inquiry by a prospective employer of a past employer the communication is entitled to a qualified privilege under Missouri law. See McDowell v. Credit Bureaus of Southeast Mo., Inc., 747 S.W.2d 630, 632-33 (Mo.1988) (en banc) (qualified privilege applied to statements by credit reporting agency); Carter v. Willert Home Products, Inc., 714 S.W.2d 506, 512-13 (Mo.1986) (en banc) (qualified privilege applied to statements made to lender by employer about employee). That privilege requires the employee to establish by clear and convincing evidence that the statement was made with actual malice, in order to be able to recover punitive damages. Williams v. Pulitzer Broadcasting Co., 706 S.W.2d 508, 512 (Mo.Ct.App.1986)
 Missouri requires that a plaintiff "prove that the defendant published the statement 'with the knowledge that it was false, or with reckless disregard for whether it was true or false at a time when defendant had serious doubt as to whether it was true.' " McDowell, 747 S.W.2d at 632, quoting Missouri Approved Instruction 23.06(2).
 
 
 [5]
 The note was not dated, nor could Burger recall the date it was received. Transcript of Proceedings at 142-43. Burger's testimony would date the note during the mid nineteen-sixties. Transcript of Proceedings at 130-32, while James McGilley Jr.'s testimony would date it during the early nineteen-seventies. Transcript of Proceedings at 729
 
 
 [6]
 Burger testified that he was never told not to do work for others during his off duty time, and that the McGilley brothers knew about his doing such work and acquiesced. During the 1960's, Burger was switched from the night shift to the day shift. He stated that he told James McGilley, Jr., that he wanted to be moved back to the night shift in order to enable him to work for other funeral homes during the day so that he could make more money. In fact, Burger read into the record the note, which showed that James McGilley, Jr., was actually aware of Burger's wanting to do work for others:
 [Burger]: The note says, "Gerald: it is hard to say thanks for the good work you have done in the past year without backing it up with a raise in pay. But as I told you before, that I will make it up to you when things settle down. If they don't settle down pretty soon, I will go ahead and put you back on nights so you can earn more money. We all appreciate all you have done in the past year, especially your willingness and cooperativeness. It sure makes my job a lot easier to have you with me and have someone who will go ahead and do things and to [sic] them right, without grumbling or bitching. May God bless you and your family through this New Year." Signed, Jim.
 Transcript of Proceedings at 143-44.
 
 
 [7]
 Transcript of Proceedings at 1110-11
 
 
 [8]
 Transcript of Proceedings at 313
 
 
 [9]
 Mark McGilley wrote three different letters after Burger's termination which supposedly explained the reasons for his discharge. Yet none of the letters stated the reason the McGilleys relayed to Burger's prospective employer: that Flagor supposedly told them that Burger had left to do embalming at Gibson-Butler Funeral Home while on duty
 In a memo to the partnership's headquarters in Texas, Mark McGilley stated that Burger was fired because of his "job performance and the fact he was working for our competition." The memo did not state that Burger's work for competitors was during his on duty time at McGilley's. Transcript of Proceedings at 969-70. In a letter to the Missouri Division of Employment Security (MDES) Mark McGilley stated:
 He was constantly late for work and on some occasions would leave work early. On many occasions he was uncooperative when asked about his vacation requests. He was working for other funeral homes in our trade area after he was informed not to do so. On occasion he would leave the funeral home premises on his on duty time without permission of management.
 Exhibit 23, Appendix at 333.
 Finally, in another letter to the MDES Mark McGilley stated: "He was told on several occasions that he was not to work for our competition and he would stop and then start up again." Exhibit 24, reprinted in Appendix at 334. Burger vehemently denied this and the record shows Burger did not work for any funeral home during on duty hours. More significant, however, the jury could clearly find that none of these letters can be read as stating the reason the McGilleys later asserted as the basis for discharging Burger.
 
 
 [10]
 The district court did not properly instruct the jury as to the proper burden of proof (clear and convincing). The defendants did not object to this omission at instruction conference and have waived their right to raise this issue under Fed.R.Civ.P. 51. Although defendants filed in the alternative for a motion for a new trial they did not assert instructional error as a basis for a new trial. The district court denied the motion for new trial. This is not appealed. The district court did review the evidence as to whether there existed clear and convincing proof to sustain a finding of malice. The district court found there was not. We now disagree for the reasons set forth. On the basis of the district court's standard of review we have likewise reviewed the evidence in terms of whether there was clear and convincing evidence of a nature to sustain the verdict. We find that there was sufficient evidence to sustain the finding