**Ruth SCHWARZ, Plaintiff,**

v.

**NORTHWEST IOWA COMMUNITY COLLEGE, f/k/a Northwest Iowa Technical College, Defendant.**

No. C 93–4077.

United States District Court,
N.D. Iowa,
Western Division.

March 15, 1995.

Jeffrey A. Neary, O'Brien, Galvin, Moeller & Neary, LeMars, IA, for plaintiff.

Thomas W. Foley, Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, IA, Thomas J. Whorley and Keith G. Thompson, Wolff, Whorley, De Hoogh & Thompson, Sheldon, IA, for defendant.

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, District Judge.

## TABLE OF CONTENTS

I  INTRODUCTION AND PROCEDURAL BACKGROUND ...................1328

II. STANDARDS FOR SUMMARY JUDGMENT ............................1329

III. FINDINGS OF FACT............................................1332
   A.  Undisputed Facts .................................................1332
   B.  Disputed Facts ..................................................1333

IV. LEGAL ANALYSIS .............................................1334
   A.  The ADEA Claim ...............................................1334
      1.  Administrative prerequisites to suit under the ADEA ................1334
      2.  The analytical framework for claims of age discrimination ............1335
      3.  Analysis of Schwarz's ADEA claim ...............................1337
         a.  Schwarz's prima facie case ..................................1337
         b.  Constructive discharge or voluntary termination.................1338
            i.  Intolerable conditions ....................................1338
            ii.  Shift changes.........................................1339
            iii.  Personal circumstances ..................................1339
         c.  The proffered legitimate reason for the College's action .........1340
   B.  The Disability Claim .............................................1341
      1.  Elements Of A Disability Discrimination Claim Under Iowa Law....1341
      2.  Analysis of Schwarz's disability claim .............................1342
         a.  Protected disability .........................................1342
            i.  Schwarz's asserted disability ..............................1342
            ii.  Vision impairments generally...............................1343

iii.   The limitation imposed by the impairment .................1343
   b.   Qualified for the position.......................................1344
   c.   Remaining elements of the prima facie case ....................1346

V.   CONCLUSION ...................................................1346

---

This apparently garden variety employment discrimination case has yielded some issues of surprising novelty. The first unusual issue to blossom in this case is whether an employee has alleged a constructive discharge where the employer allegedly knew of and exploited the employee's physical impairment to force the employee to quit. The second novel issue to bloom from the record is whether an unusual vision problem, described as "night blindness," constitutes a protected disability under Iowa law in the circumstances of this case.

A community college has moved for summary judgment in its favor on a former employee's claims of age discrimination in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, and disability discrimination in violation of the Iowa Civil Rights Act, Iowa Code Ch. 216. The former employee claims that she was constructively discharged from her position as a library clerk when her employment schedule was changed to a shift running from 12:30 p.m. until 9:00 p.m. The former employee asserts that she suffers from "night blindness," which made it impossible for her to commute home after a work day ending in the evening. She asserts that, in addition to discriminating against her on the basis of her "night blindness" disability, the community college used the shift change to force her to quit her position because she had been reluctant to retire, thus discriminating against her on the basis of age. The community college has moved for summary judgment on the grounds that the former employee cannot establish a *prima facie* case of either age or disability discrimination, and that even if she can, she cannot establish a genuine issue of material fact that the community college's proffered reason for changing her employment hours was a pretext for discrimination.

## I.   INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Ruth Schwarz filed her complaint in this matter on September 9, 1993, against her former employer, the Northwest Iowa Community College (the College), formerly known as Northwest Iowa Technical College, located in Sheldon, Iowa. The complaint alleges that Schwarz, who was 63 years old at the time, was constructively discharged on September 9, 1991, from her position as a library clerk at the College's central library as the result of a change in her work schedule which required her to work weekdays from 12:30 p.m. until 9:00 p.m. instead of from 8:00 a.m. until 4:30 p.m.

The complaint is in two counts. Count I alleges that Schwarz was constructively discharged in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, asserting that the reason for the shift change was to compel Schwarz to resign, because defendant allegedly knew that Schwarz would be unable to drive safely after dark in order to commute to her home. Count II alleges that Schwarz's constructive discharge was also because of a disability, namely "night-blindness," in violation of Iowa Code Ch. 216. This count alleges that the College failed to make reasonable accommodations for Schwarz's disability.

Following her alleged constructive discharge, Schwarz filed a complaint with the Iowa Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission on November 19, 1991. On December 11, 1992, Schwarz received a notice from the ICRC informing her that it had found that probable cause existed on her claim of age discrimination, but Schwarz did not pursue the administrative proceedings or file suit in an Iowa state court.

Instead, Schwarz filed this federal complaint on September 9, 1993. The College answered the complaint on November 23, 1993. Schwarz moved for partial summary judgment on October 3, 1994, asserting that the state agency proceedings had *res judicata* effect in these federal proceedings. The motion was denied on October 11, 1994, on the ground that the Supreme Court's decision in *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 113, 111 S.Ct. 2166, 2172, 115 L.Ed.2d 96 (1991), held that Congress did not intend to give estoppel effect to findings of state administrative agencies concerning claims under the ADEA. On January 12, 1995, the court granted the parties' joint motion to extend the deadlines for discovery and to file dispositive motions in this case. On February 15, 1995, the extended deadline for filing dispositive motions, the College moved for summary judgment on the entirety of Schwarz's complaint. Schwarz resisted the motion on March 1, 1995.

The College has moved for summary judgment on Schwarz's disability claim, first, on the ground that Schwarz cannot establish a *prima facie* case of disability discrimination because "night blindness" is not a protected disability. The College argues further that even if "night blindness" is a protected disability, Schwarz can neither establish the other elements of a *prima facie* case, nor establish a genuine issue of material fact that the College's proffered reason for changing Schwarz's work schedule is a pretext for discrimination. The College argues for summary judgment on Schwarz's age discrimination claim on similar grounds: inability to establish a *prima facie* case of age discrimination or to establish a genuine issue of material fact that the proffered reason for changing Schwarz's work schedule is a pretext for age discrimination.

Schwarz asserts that there is at least a genuine issue of material fact on the issue of whether "night blindness" is a protected disability and on the elements of her *prima facie* claim of either disability or age discrimination. She argues further that there is at least a genuine issue of material fact that the College's proffered non-discriminatory reason for its action is a pretext for discrimina-

tion. Schwarz contends that the College has proffered inconsistent reasons for its actions in the administrative proceedings and in these proceedings, and, further, contends that she was pressured to resign by repetitive inquiries into her likely retirement date when she had made clear she had no present intention to retire.

The court held oral arguments on the motion for summary judgment on March 13, 1995, in Sioux City, Iowa. Plaintiff was represented at the oral arguments by counsel Jeffrey A. Neary of O'Brien, Galvin, Moeller & Neary, in LeMars, Iowa. Defendant was represented by Thomas W. Foley of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., in Des Moines, Iowa, and by Thomas J. Whorley and Keith G. Thompson of Wolff, Whorley, De Hoogh & Thompson, in Sheldon, Iowa. The matter is now fully submitted. Counsel for both parties ably argued their positions and the oral arguments were of considerable assistance to the court in disposing of this motion for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir.1992).

■ The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[1] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Schwarz, and give Schwarz the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

■ Procedurally, the moving party, here the College, bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). The College is not required by *Rule 56* to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

■ "When a moving party has carried its burden under *Rule 56(c),* its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Schwarz is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flex-*

---

1. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel,* 953 F.2d at 394.

*way Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If Schwarz fails to make a sufficient showing of an essential element of a claim with respect to which she has the burden of proof, then the College is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247.

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir. 1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Id.* (holding that there was a genuine issue of material fact precluding summary judgment); *Johnson*, 931 F.2d at 1244.

This court has applied these standards to motions for summary judgment in a variety of employment discrimination cases, with varying results. *See Schallehn v. Central Trust and Sav. Bank*, 877 F.Supp. 1315 (N.D.Iowa 1995) (finding that genuine issues of material fact precluding summary judgment on an employee's ADEA claim); *Naylor v. Georgia–Pacific Corp.*, 875 F.Supp. 564 (N.D.Iowa 1995) (finding that genuine issues of material fact precluded summary judgment on an employee's claims of race discrimination and retaliatory discharge); *Mummelthie v. City of Mason City, Iowa*, 873 F.Supp. 1293 (N.D.Iowa 1995) (granting summary judgment in favor of defendants on an employee's ADEA claim for failure to exhaust administrative remedies, but denying summary judgment on § 1983 claim of violation of right to equal protection because court found genuine issues of material fact); *Thompto v. Coborn's, Inc.*, 871 F.Supp. 1097 (N.D.Iowa 1994) (granting summary judgment as to some claims, but denying summary judgment on claim of retaliatory discharge in violation of public policy); *O'Bryan v. KTIV Television*, 868 F.Supp. 1146 (N.D.Iowa 1994) (granting summary judgment, *inter alia*, on ADEA claim, retaliatory discharge claims, and Title VII claim because plaintiff failed to generate a genuine issue of material fact); *Thomas v. St. Luke's Health Sys., Inc.*, 869 F.Supp. 1413 (N.D.Iowa 1994) (granting summary judgment for failure to generate a genuine issue of material fact on race discrimination claim); *Chester v. Northwest Iowa Youth Emergency Ctr.*, 869 F.Supp. 700 (N.D.Iowa 1994) (granting summary judgment on Title VII claims because the employer did not have sufficient employ-

ees, and dismissing entire case for lack of a federal question); *Hargens v. U.S. Dep't of Agriculture,* 865 F.Supp. 1314 (N.D.Iowa 1994) (granting summary judgment on Rehabilitation Act claim for failure to exhaust administrative remedies, but denying summary judgment on the basis of a genuine issue of material fact on retaliatory discharge claim); *Susie v. Apple Tree Preschool and Child Care Ctr.,* 866 F.Supp. 390 (N.D.Iowa 1994) (denying plaintiff employee's motion for summary judgment on discriminatory intent under the ADA on the basis of genuine issues of material fact); *Rouse v. Farmers State Bank of Jewell, Iowa,* 866 F.Supp. 1191 (N.D.Iowa 1994) (granting summary judgment on all claims except age discrimination, but dismissing entire case for lack of a federal question). With these standards in mind, the court turns to consideration of the College's motion for summary judgment.

### III. FINDINGS OF FACT

#### A. Undisputed Facts

The record reveals that the following facts are not in dispute. Ruth Schwarz, who was 63 years old in September of 1991, was employed in a full-time, hourly wage position as a library clerk in the College's central library. At oral arguments, the parties stipulated to the fact that at all times relevant to this litigation, Schwarz lived in Granville, Iowa, a town of about 300 people, approximately sixteen miles from the College's location in Sheldon, Iowa. The College is a "full-service" community college, and it employs approximately 81 full-time employees and 14 part-time employees. The College's enrollment is currently 381 full-time and 207 part-time students.

Schwarz began her employment with the College in October of 1984 as a part-time employee in the "Green Thumb" program, which was a federal program intended to encourage the employment of older employees. Schwarz became a full-time employee in January of 1987 when the College completed construction of a new central library. From January of 1987 until her termination in September of 1991, Schwarz worked weekdays from 8:00 a.m. until 4:30 p.m. Her duties throughout her part-time and full-time employment in the College library were to assist the librarian, Vera Osland, in maintaining the library's collection of books, periodicals, and other resource materials, and to assist students in locating materials. There is no dispute that Schwarz's work performance was adequate.

The College hierarchy as it pertained to Schwarz was, from the top down, Dr. Carl Rolf, President of the College, 54 years of age, who was responsible, *inter alia,* for decisions regarding the appropriate staffing levels of College facilities; Vice President Vern Schoeneman, Dean of College Services and director of personnel, and Vice President Kathy Brock, whose responsibilities were instructional services, including the library; and Vera Osland, the College Librarian, and Schwarz's immediate supervisor. Other employees of the library included work-study students who worked primarily during the evening hours.

In the summer of 1991, Dr. Rolf, Ms. Osland, and Mr. Schoeneman decided to realign library staffing hours so that at least one full-time staff member would be on duty during all hours the library was open. The College left Ms. Osland with the "day" hours, and changed Schwarz's schedule to noon (or 12:30) until 9:00 p.m.[2] In June of 1991, Schwarz was informed of the schedule change to become effective as of September 10, 1991, the first day of the fall semester at the College. Schwarz asked for and received written confirmation of this reassignment. On or about July 9, 1991, Schwarz provided the College with a written statement from David L. Gohman, O.D., which stated, in pertinent part:

> [Printed:] Significant Complaint/History [Handwritten:] Ruth can't drive at night because it is hard to judge distances and is light sensitive to oncoming car lights. . . .

---

**2.** The discrepancy among the complaint, affidavits, and statements of fact concerning whether Schwarz was to begin each work day of the new schedule at noon or 12:30 is immaterial to the disposition of this summary judgment motion. The parties agree that her hours were to extend into the evening for a "full-time" work day.

[Printed:] Diagnosis [Handwritten:] No change in lens Rx. Because Ruth's right eye is amblyopic, this causes problems with depth perception and this is more noticeable at night (harder to judge how close other cars are to her). Also Ruth's retinal light sensitivity is high so car lights at night adversely affect vision.

[Printed:] Treatment/Recommendations [Handwritten:] No change in lens Rx is necessary. Recommend daylight driving only.

Defendant's Exhibit D, Defendant's Statement of Material Facts. On August 21, 1991, plaintiff submitted a letter of resignation to Kathy Brock, identified as Dean of Instruction of the College. The letter, in its entirety, is as follows:

Dear Kathy,

As you know, eyesight problems prohibit my driving after dark. Therefore, with the change in my work schedule from daylight to night hours, I am forced to give up my job.

My personnel record will show that I did my assigned work well—I certainly did my best, and I regret leaving. However, at this time I have no choice.

Therefore, effective at the end of the day on September 9, I am resigning my job.

Defendant's Exhibit E, Defendant's Statement of Material Facts.

At the time that Schwarz terminated her employment at the College library, the College had openings for a part-time custodian and a secretary. Schwarz did not apply for the custodial position. She did apply for the secretarial position, but later withdrew her application.

### B. Disputed Facts

Schwarz asserts that there are disputes as to a number of facts that she argues are material. The record reveals other factual disputes. First, there is a dispute as to the reason that the College decided to rearrange staffing assignments at the College library. Schwarz asserts that the College represented to the ICRC and to her that the reassignment was necessary to meet national college accreditation requirements. However, that reason has not been proffered here, and was specifically denied in the depositions of Dr. Rolf and Mr. Schoeneman. Instead, the representatives of the College now assert that library "traffic" in the evenings had increased, such that a full-time employee was necessary to provide better service than part-time work-study students could provide. In her deposition, Schwarz disputes this reason, on the ground that in her experience, early afternoons were peak periods, but evenings were extremely slow. The College's representatives have also testified that the use of the library by college faculty was highest during the day hours, and that a qualified librarian was required to assist faculty members with their research and course preparation, while Schwarz's skills were sufficient to assist students, but not faculty members. The College therefore states that it was deemed appropriate for the qualified librarian to cover the day hours. Schwarz suggests that there was no such demand by faculty members for services requiring the qualified librarian.

Schwarz also asserts that on several occasions Vera Osland asked Schwarz what her intentions were regarding retirement even though Schwarz had indicated that she did not intend to retire in the near future. Schwarz contends that these inquiries, in the face of her assertions that she did not intend to retire, indicate a desire on the part of College representatives to "move [her] out as she neared age 62," and suggest discriminatory intent.

The College has also presented evidence that creates a dispute as to the nature and extent of Schwarz's vision problems and their effect upon her ability to drive at night. The College has submitted an undated report from Allen S. Jones, O.D. P.C.,[3] which states that

I think Ruth's corneal irritation should be addressed first and vigorously. She may be slightly sensitive now but as tear film normalizes sensitivity will greatly decrease

---

3. At oral arguments, the parties stipulated that the examination by Dr. Jones took place in early February of 1995, and that his report followed shortly after.

and this is definitely not a night blindness situation. Monocular depth perception is highly effective over time and quite adoptive. Adapting to the prescription change would probably enhance depth perception to some extent. . . .

Defendant's Exhibit F, Defendant's Statement of Material Facts. In response to this report, Schwarz was reevaluated by Dr. Gohman. His report, dated February 27, 1995, states as follows:

DIAGNOSIS/IMPRESSION:

1. Ruth has significant anisometropia (variation in refractive errors in the two eyes). Her right eye is more nearsighted (by −2.50 Diopters) than the left eye. In the past, a correction for the right [eye] had been tried but Ruth couldn't adapt to the lens difference and would get headaches. She was more comfortable with the right eye not corrected. Since Ruth basically has monocular vision with the right eye not corrected, depth perception will be affected especially at night because the monocular clues for depth perception are harder to discern. This could affect a persons [sic] driving ability at night.

2. Artificial tears were given to Ruth. The lubricant drops will help the dry eye (cornea) condition which may help light sensitivity.

Plaintiff's Exhibit, Brief In Support Of Plaintiff's Resistance To Motion For Summary Judgment.

In addition to this dispute over the nature and extent of Schwarz's vision problems, the record reveals a dispute over facts affecting accommodation of Schwarz's need or desire not to drive at night. The College states, in its statement of material facts, that accommodation of Schwarz's eye restrictions would have placed an undue hardship on the College, because it would have required hiring a part-time librarian or library clerk for the evening hours when the College had been required by financial pressures during "the past 4 years" to terminate four administrative positions, three full-time and one part-time. The College also argues, in its brief, that Schwarz's inability to drive at night made her unqualified for her position. Schwarz argues that accommodation in the form of rescheduling was possible and that she was in all respects qualified to perform the job of library clerk.

## IV. LEGAL ANALYSIS

### A. The ADEA Claim

The ADEA's goal is to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Thus, the ADEA forbids employment discrimination against employees aged forty and older. 29 U.S.C. § 631(a); Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 448 (8th Cir.1993). It provides that it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[4]

### 1. Administrative prerequisites to suit under the ADEA

The ADEA requires that within 180 days of the alleged unlawful conduct by an employer, the employee file a charge outlining the unlawful conduct with the Equal Employment Opportunity Commission (EEOC). 29 U.S.C. § 626(d) (1982).[5] The EEOC then

---

4. The ADEA prohibitions protect workers over age forty. 29 U.S.C. § 631(a). As originally enacted, the ADEA covered employees from 40 to 65 years old. Pub.L. No. 90–202, § 12, 81 Stat. 607 (repealed 1978). The maximum age was raised in 1978 to cover persons aged 40 to 70 years. Pub.L. No. 95–256, § 3, 92 Stat. 189 (repealed 1986). In 1986 Congress removed the upper age limitation entirely, Pub.L. No. 99–592, § 2, 100 Stat. 3342–43 (codified at 29 U.S.C. § 631(a)), except for bona fide mandatory retirement laws for firefighters and law enforcement officers, Id. §§ 3–4, 100 Stat. 3342–43 (codified at 29 U.S.C. § 623(i), and tenure for college professors over age 70. Id. § 6, 100 Stat. 3344 (codified at 29 U.S.C. § 631(d)).

5. 29 U.S.C. § 626(d)(1) states the following:

notifies the employer and seeks "to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." *Id.* If the parties have not compromised after 60 days, the employee can file a civil suit under the ADEA. *Id. See also Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (notice must be given of the intention to sue so that the EEOC or Secretary of Labor can attempt to eliminate the alleged unlawful practice through informal methods); *Brooks v. Monroe Sys. For Business, Inc.,* 873 F.2d 202, 205 (8th Cir.) ("The ADEA states that a civil action may not be commenced until sixty days after a charge alleging unlawful discrimination has been filed with the EEOC," citing 29 U.S.C. § 626(d)), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989).[6] Filing with the EEOC is a condition precedent to later filing a suit under the ADEA. *Boge v. Ringland–Johnson–Crowley Co.,* 976 F.2d 448, 450–51 (8th Cir.1992) (filing of charge with EEOC is required before employee may initiate a civil suit under the ADEA); *Heideman v. PFL, Inc.,* 904 F.2d 1262, 1265 (8th Cir.1990) (filing with EEOC is a "prerequisite" to suit under the ADEA), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991); *Walker v. St. Anthony's Medical Ctr.,* 881 F.2d 554, 556 (8th Cir.1989) (timely filing of EEOC charge is "prerequisite" to suit); *Brooks,* 873 F.2d at 205 (EEOC filing is a "condition precedent" to suit under the ADEA); *Kriegesmann v. Barry–Wehmiller Co.,* 739 F.2d 357 (8th Cir.) (EEOC filing is condition precedent to suit), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83

L.Ed.2d 402 (1984). Schwarz met this prerequisite for filing suit under the ADEA.

### 2. The analytical framework for claims of age discrimination

The allocation of the burden of proof in ADEA cases has been held to be the same as in cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e–17 (1988). *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993); *Beshears v. Asbill,* 930 F.2d 1348, 1353 nn. 6 & 7 (8th Cir.1991). *See also Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 888–89 (9th Cir. 1994) (citing *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420 (9th Cir.1990)); *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir.1993) (citing *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)); *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1425 n. 2 (10th Cir.1993) (citing *MacDonald v. Eastern Wyoming Mental Health Ctr.,* 941 F.2d 1115, 1119 (10th Cir.1991)); *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 180 (2d Cir.1992) (citing *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989)); *United States EEOC v. Century Broadcasting Corp.,* 957 F.2d 1446, 1450 (7th Cir.1992) (citing *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991)). Similarly, the burdens of establishing a *prima facie* case of discrimination are the same under the ADEA, Title VII, and § 1983. *Hicks v. St. Mary's Honor Ctr.,* 970 F.2d 487, 490–91 (8th Cir.1992), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Rich-*

---

No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed—

(1) within 180 days after the alleged unlawful practice occurred ...

**6.** A *federal* employee claiming age discrimination in violation of the ADEA

has the option of bringing suit in federal court in the first instance, or of pursuing administrative remedies before the EEOC and then suing in federal court if not satisfied with the administrative results. *See* 29 U.S.C. § 633a(b) and (c). With respect to civil actions brought directly to federal court, the federal employee must give the EEOC notice of intent to sue

within 180 days of the alleged discriminatory conduct, and then must wait 30 days before filing suit. *Id.* § 633a(d). The ADEA provisions applicable to federal employees who pursue administrative remedies before initiating a private suit do not, however, contain an express statute of limitations to govern how long after final agency action the employee has to file a civil action. We must therefore "borrow" an appropriate limitations period from an analogous state or federal provision. *Stevens v. Department of Treasury,* 500 U.S. 1, 7, 111 S.Ct. 1562, 1567, 114 L.Ed.2d 1 (1991). *Long v. Frank,* 22 F.3d 54, 56 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995); *see also Adler v. Espy,* 35 F.3d 263, 264 (7th Cir.1994).

*mond v. Board of Regents of the Univ. of Minnesota,* 957 F.2d 595, 598 (8th Cir.1992) (burden of showing *prima facie* case of discrimination is the same under Title VII, § 1981, § 1983, or the ADEA).

It is axiomatic that employment discrimination need not be proved by direct evidence, and indeed, that doing so is often impossible, because, as the Supreme Court has said, "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1108 (8th Cir.) (citing *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). Thus, in employment discrimination cases based on circumstantial evidence, courts apply the analytical framework of shifting burdens developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and most recently in *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Gaworski,* 17 F.3d at 1108.

Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and overcome by evidence produced by the defendant. *White v. McDonnell Douglas Corp.,* 985 F.2d 434, 435 (8th Cir.1993). To establish a *prima facie* case of discrimination under Title VII, the ADEA, or § 1983, the plaintiff must show that the defendant terminated the plaintiff under circumstances which gave rise to an inference of unlawful discrimination. *Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 945 (8th Cir.1994); *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1242 (8th Cir.1991) (Title VII discriminatory discharge case).

If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *White,* 985 F.2d at 435. The employer's explanation of its actions must be "clear and reasonably specific," *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096, but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone,* 24 F.3d 1330, 1334 (11th Cir.1994) (citing *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1019 (11th Cir.1994)). If the employer meets this burden of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749.

The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *White v. McDonnell Douglas Corp.,* 985 F.2d 434, 436 (8th Cir.1993); *United States v. Johnson,* 28 F.3d 1487, 1494 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *Johnson,* 931 F.2d at 1242; *Brooks v. Monroe Systems For Business, Inc.,* 873 F.2d 202, 204 (8th Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1408 (8th Cir.1987). However, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 971 (8th Cir.1994) (quoting *St. Mary's* ); *EEOC v. Cherry–Burrell Corp.,* 35 F.3d 356, 361 (8th Cir.1994) (quoting *St. Mary's* ); *Gawor-*

*ski,* 17 F.3d at 1109 (quoting *St. Mary's* ); *Hicks v. St. Mary's Honor Ctr.,* 2 F.3d 265, 266 (8th Cir.1993) (quoting *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749); *Brooks,* 873 F.2d at 204 (submission by the employer of a discredited reason for discharging or failing to promote a person is itself evidence of discriminatory motive.).

In two recent decisions, the Eighth Circuit Court of Appeals has considered in more detail the plaintiff's burden to show discriminatory intent when the employer has offered a legitimate, non-discriminatory reason for its actions. *See Lidge–Myrtil v. Deere & Co.,* 49 F.3d 1308 (8th Cir.1995); *Krenik v. County of Le Sueur, Minn.,* 47 F.3d 953 (8th Cir.1995). In *Krenik,* the court held that

> [t]o survive summary judgment at the third stage of the *McDonnell Douglas* analysis, a plaintiff must demonstrate the existence of evidence of some additional facts that would allow a jury to find that the defendant's proffered reason is pretext and that the real reason for its action was intentional discrimination. *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2747. These additional facts may be limited solely to proof of pretext. . . .

*Krenik,* 47 F.3d at 958; *Lidge–Myrtil,* 49 F.3d at 1310–11 (the plaintiff "must produce 'some additional evidence beyond the elements of the *prima facie* case' that would allow a rational jury to reject [the employer's] proffered reasons as a mere pretext for discrimination," quoting *Krenik* ). In *Krenik,* the court noted that the "additional facts" could be limited to evidence that would cast disbelief and a suspicion of mendacity upon the employer's proffered legitimate reasons, citing *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2749, but the court held that the plaintiff must produce "some additional evidence beyond the elements of the *prima facie* case to support a finding of pretext. Thus, [plaintiff's] argument that she was entitled to a full trial once both parties had met their initial burdens fails as a matter of law." *Krenik,* 47 F.3d at 958. In *Lidge–Myrtil,* the court held, first, that the plaintiff's abilities alone cannot rebut the employer's stated reasons for its action. *Lidge–Myrtil,* 49 F.3d at 1310–11. Next, the

court rejected as inadequate plaintiff's "additional facts" in the form of a "single offhand hearsay comment by an unnamed co-worker" offered as proving discriminatory animus on the part of the employer. *Id.* at 1311–12. Finally, the plaintiff was unable to produce persuasive evidence of disparate treatment because she could identify no comparably situated employees not of her protected class who were treated differently. *Id.*

█ The court will therefore consider, if Schwarz presents an adequate *prima facie* case, if she has also presented "additional facts" to rebut the College's proffer of a legitimate, non-discriminatory reason for its actions, sufficient to create a genuine issue of material fact as to discriminatory intent. However, the finding of discriminatory intent is generally for the trier of fact. *Burger v. McGilley Memorial Chapels, Inc.,* 856 F.2d 1046, 1047 (8th Cir.1988).

### 3. *Analysis of Schwarz's ADEA claim*

Because the College has challenged the adequacy of Schwarz's *prima facie* case, the court will first consider whether Schwarz has made the necessary *prima facie* showing, then, if necessary, turn to consideration of the College's attempts to rebut the presumption of discrimination that arises from an adequate *prima facie* case.

#### a. *Schwarz's prima facie case*

█ The *prima facie* case criteria differ for each type of employment decision. *Davenport,* 30 F.3d at 944; *Hervey v. City of Little Rock,* 787 F.2d 1223, 1231 (8th Cir. 1986). Thus, in a case alleging age discrimination, the elements of the *prima facie* case are: (1) that the plaintiff was a member of a protected group on the basis of his or her age; (2) that the plaintiff was performing his or her job at a level that met the employer's legitimate expectations; (3) that plaintiff was discharged; and 4) that the employer replaced or attempted to replace the plaintiff with a younger person. *Radabaugh,* 997 F.2d at 447; *Beshears,* 930 F.2d at 1353; *Raschick v. Prudent Supply, Inc.,* 830 F.2d 1497, 1499 (8th Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

Contrary to the College's assertions, the court finds that Schwarz has established, or has established a genuine issue of material fact as to, all of the elements of her *prima facie* case of age discrimination. Schwarz was undeniably a member of the protected group on the basis of her age, 63 at the time of her termination, and her performance of her job was undeniably adequate prior to her termination. Nowhere in the record is there any indication that Schwarz's performance was ever considered inadequate by anyone. Schwarz has been replaced by a younger person. Thus, the only sticking point appears to be whether Schwarz was "discharged" or merely quit.

### b. Constructive discharge or voluntary termination

Schwarz claims that she was constructively discharged, because her employer, who knew about her night vision problems,[7] forced her to quit by imposing an intolerable condition, namely night driving, on her continued employment. It is plaintiff's theory that the College changed her work day schedule to include evening hours for the purpose of forcing her to quit. The College contends that nothing about the workplace conditions it provided was intolerable. At oral arguments, the College argued that Schwarz's vision problems and consequent difficulties with night driving were personal circumstances for which it is not responsible.

*i. Intolerable conditions.* A constructive discharge exists when an employer deliberately renders the employee's working conditions intolerable and thus forces the employee to quit. *Smith v. World Ins. Co.*, 38 F.3d 1456, 1460 (8th Cir.1994); *Hukkanen v. Int'l Union of Operating Engineers, Hoisting & Portable Local No. 101*, 3 F.3d 281, 284 (8th Cir.1993) (citing the *"Bunny Bread"* standards for this kind of claim found in *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir.1981)); *Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d 467, 472 (8th Cir.1991)); *Smith v. Cleburne County Hosp.*, 870 F.2d 1375, 1381 (8th Cir.), *cert. denied*, 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 100 (1989); *Southside Pub. Sch. v. Hill*, 827 F.2d 270, 274 (8th Cir.1987). First, the conditions created by the employer must be such that a reasonable person similarly situated to the plaintiff employee would find them intolerable. *World Ins. Co.*, 38 F.3d at 1460; *Hukkanen*, 3 F.3d at 284; *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1217 (8th Cir.1985), *cert. denied*, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *Bunny Bread*, 646 F.2d at 1256 (8th Cir.1981). Second, the employer's actions must have been taken with the intention of forcing the employee to quit. *World Ins. Co.*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284; *Bunny Bread Co.*, 646 F.2d at 1256. If there is no evidence that the defendant took actions with an intent to force the plaintiff to quit, even if conditions were intolerable, plaintiff's claim fails. *Craft*, 766 F.2d at 1217.

The standards in *Bunny Bread* do not mean constructive discharge plaintiffs must prove their employers consciously meant to force them to quit. *World Ins. Co.*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284. But, when an employer denies a conscious effort to force an employee to resign, the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions. *World Ins Co.*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284–85. A plaintiff alleging constructive discharge may therefore satisfy *Bunny Bread's* intent requirement by showing his or her resignation was a reasonably foreseeable consequence of the employers' discriminatory actions. *World Ins Co.*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284–85. However, where an employer has attempted to accommodate an employee, the employer has been held not to have constructively discharged the employee. *Cleburne County Hosp.*, 870 F.2d at 1380–81. The Eighth Circuit Court of Appeals recently

---

7. Although it was not entirely clear from the record who had what knowledge concerning Schwarz's vision problems when, the parties agreed at oral arguments that Vera Osland knew of Schwarz's vision problems and concern about driving at night for some time prior to the decision to change Schwarz's work schedule. The parties agreed that Osland had on one or more occasions offered Schwarz rides to evening events or meetings to allay Schwarz's fears of driving at night with her vision difficulties.

found that a constructive discharge has been shown where the employer offers the employee a choice that is essentially between quitting or continuing to work under intolerable conditions, for example, working under the threat of termination without benefit. *World Ins. Co.*, 38 F.3d at 1461.

***ii. Shift changes.*** In the few cases in which courts have considered whether a shift change alone presents an intolerable condition for an employee who quits rather than accept the new work schedule, the courts have found no constructive discharge. *See, e.g., Dwyer v. City of Middletown,* 928 F.2d 404 (6th Cir.1991) (unpublished decision; text available in 1991 WL 35140) (in case where police officer was temporarily assigned to 7:00 a.m. to 3:00 p.m. shift, then was permanently assigned to 3:00 p.m. to 11:00 p.m. shift, the court concluded "[t]here is no evidence that these assignments would constitute working conditions so intolerable that a reasonable person would have felt compelled to resign."); *Thakkar v. Provident Nat'l Bank,* 58 F.E.P. Cas. 1435, 1438, 1991 WL 274827 (E.D.Penn.1991) ("An employer ... does not subject an employee to 'intolerable' working conditions by insisting that he work his assigned schedule.").[8] The issue in this case, however, is not merely whether the change in hours worked a constructive discharge, but whether a change in hours which placed particular burdens on an employee because of a physical problem imposed intolerable conditions upon that employee's continued employment.

***iii. Personal circumstances.*** At oral arguments, the court expressed some concern about the extent to which the College was responsible for the intolerableness of Schwarz's working conditions when it is owing only to Schwarz's peculiar circumstances that night driving presented what she considered to be an intolerable condition of her employment. The College then argued that it had nothing to do with the creation of the conditions Schwarz found intolerable, and that there has been no suggestion that the employment conditions at Schwarz's workplace were in any way unsatisfactory, let alone intolerable. The College asserts that it is the employee's responsibility to secure transportation to and from the workplace.

Courts have held that an employee's personal circumstances do not constitute grounds for a claim that the employer constructively discharged the employee. *See, e.g., Cherchi v. Mobil Oil Corp.,* 693 F.Supp. 156 (D.N.J.1988) (employer not responsible for the health problems of an employee's mother or employee's problems with his girlfriend and her daughter which made it "intolerable" for employee to relocate as requested by the employer), *aff'd,* 865 F.2d 249 (3d Cir.1988) (Table); *Weihaupt v. American Medical Ass'n,* 46 F.E.P. Cas. 377, 380, 1988 WL 20050 (N.D.Ill.1988) (employee who opted for early retirement because of cancer was not constructively discharged, because "an employee must sometimes choose a course of action within a limited context of relatively distasteful options," but an employer is not responsible for the creation of an employee's health problems such as to constitute grounds for a claim of constructive discharge), *aff'd,* 874 F.2d 419 (7th Cir.1989). Yet, this case is distinguishable from a simple "personal circumstances" case, because it is the plaintiff's theory that the College knew of and intentionally exploited her personal circumstances, her vision problems, to force her to quit. For this reason, the court is inclined to allow the case to be decided by the trier of fact, who, upon a full record, will be able to assess whether the College knew of and exploited Schwarz's vision problems

---

**8.** Other cases raising a similar issue do not decide it. In *Kenrich Petrochemicals, Inc. v. N.L.R.B.,* 893 F.2d 1468 (3d Cir.), *cert. denied,* 498 U.S. 981, 111 S.Ct. 509, 112 L.Ed.2d 522 (1990), the court found that an employee who refused to work scheduled hours after a shift change had failed to present evidence of a constructive discharge because she had not terminated her employment, but had instead "attempted to continue her employment under terms which she unilaterally selected." *Kenrich,* 893 F.2d at 1486–87. In *Montano v. Amstar Corp.,* 502 F.Supp. 295, 295 (E.D.Penn.1980), the court was presented with a case in which the plaintiff claimed constructive discharge on the basis of a change in work hours, but no reported or unreported decision in that case addresses the merits of that claim; instead, the reported decision considers only whether or not the plaintiff could amend the complaint to add further allegations of sexual harassment.

for the purpose of forcing her to quit. If these matters are proved, a jury may be entitled to find that Schwarz was constructively discharged.[9]

In this case, there is a least a genuine issue of material fact as to whether or not the College knew, or should reasonably have foreseen, that requiring a person with concerns about his or her ability to drive at night to work a shift ending at 9:00 p.m. would force that person to make a choice between quitting or enduring the intolerable condition of attempting to drive at night against a doctor's advice and at some risk to that person's health and safety. The court is not convinced that the College showed that a reasonable person similarly situated to the plaintiff here would not find it intolerable to work the afternoon to evening shift. Thus, the College is not entitled to summary judgment on the ground that, as a matter of law, Schwarz cannot show a constructive discharge. Schwarz has therefore established, just barely, her *prima facie* case to the degree necessary to preclude summary judgment.

### c. The proffered legitimate reason for the College's action

If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *White*, 985 F.2d at 435. However, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's*, —— U.S. at ——, 113 S.Ct. at 2749. The finding of discriminatory intent is generally for the trier of fact. *Burger*, 856 F.2d at 1047. Thus, in the present case, if there is a genuine issue of material fact on Schwarz's *prima facie* case, and a genuine issue of material fact as to the credibility of defendants' proffered legitimate basis for their employment decision, there is also a genuine issue of material fact on discriminatory intent, which is generally for the trier of fact to decide.

At oral arguments, the College suggested that it should be entitled to the inference that Schwarz's termination was not the result of discrimination because the same persons who had hired her were involved in the decision that led to her termination. In *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209 (4th Cir.1994), the Fourth Circuit Court of Appeals adopted the inference that where the person hiring and the person firing are the same person, " 'there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer....' " *Tyndall*, 31 F.3d at 214 (quoting from *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991)). The Eighth Circuit Court of Appeals has followed the rule in *Proud* in *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173 (8th Cir.1992). This court has previously considered the applicability of this inference to cases under both the ADEA and ADA. *See Susie v. Apple Tree Preschool & Child Care Ctr.*, 866 F.Supp. 390, 396 (N.D. Iowa 1994) (suggesting that the inference is less applicable to ADA cases than to ADEA cases); *Holmes v. Marriott Corp.*, 831 F.Supp. 691, 699–702 (S.D. Iowa 1993) (finding that in an ADEA case, the *Proud–Lowe* rule "should not be applied in an iron clad fashion.").

■ The College argues that both Vera Osland and Vern Schoenemann were involved in both Schwarz's hiring and the decision to change her hours which led to her termination. Schwarz argues, however, that Dr. Rolf was an entirely new actor in the decisions leading to her termination. The court concludes that the involvement of Dr. Rolf is sufficient not to apply the *Proud–Lowe* rule in this case.

■ The College also argues that because it hired Schwarz under a federal program intended to encourage the hiring of older employees, then kept her and promoted

---

9. The parties have not yet had adequate opportunity to brief or argue the question of whether or not such exploitation by an employer of an employee's personal circumstances in order to compel the employee to quit would constitute constructive discharge. Should the jury return a verdict on that basis, the court will require the parties to brief the question as part of its post-trial review of the verdict, and will carefully review the sufficiency of the evidence upon which such a verdict is based.

her to full-time status after that program had terminated, it should be entitled to the inference that its actions in changing her hours were not intended to discriminate on the basis of age. The court concludes that the weight of this evidence should be left to the determination of the trier of fact.

The court finds that there is at least a genuine issue of material fact as to the reason that the College made the scheduling changes leading to Schwarz's termination. Schwarz has offered "additional facts" to support her efforts to rebut the College's offer of a legitimate, non-discriminatory reason for its actions. Schwarz has alleged, and the College has not denied, that the College has offered widely disparate reasons in the administrative and federal court proceedings, accreditation requirements versus patron demands, respectively.[10] The first reason has plainly been discredited by the deposition testimony of the College's own representatives. Schwarz has at least established a genuine issue of material fact as to the credibility of the second reason based on her own observations of the flow of patron "traffic" in the library and the needs of those patrons. The court concludes that Schwarz has established a genuine issue of material fact as to the credibility of the proffered legitimate reason for the College's actions.

Nor can the court conclude as a matter of law that the College has rebutted the inference of discriminatory intent by its assertion that age had nothing to do with its decision and that the rescheduling decisions were made to improve library service. "There will seldom be 'eyewitness' testimony as to the employer's mental processes," *Gaworski,* 17 F.3d at 1108, and the trier of fact is entitled to consider whether the assertions that age was not a factor and that the rescheduling decisions were legitimate are creditable in light of all of the evidence. Therefore, the College is not entitled to summary judgment on Schwarz's claim of age discrimination, because the court finds that Schwarz has established a genuine issue of material fact as to

the essential elements of such a claim and the credibility of the College's proffered legitimate reason for its actions. The College's motion for summary judgment on Schwarz's ADEA claim must be denied.

### B. The Disability Claim

The College has moved for summary judgment on Schwarz's state-law claim of disability discrimination on much the same grounds as it argued for summary judgment on the ADEA claim: The College contends that Schwarz cannot establish a *prima facie* case of disability discrimination and cannot show that the College's proffered legitimate reason for its actions is pretextual. The court determined above that there is at least a genuine issue of material fact that the College's actions were pretextual. Thus, whether or not the College is entitled to summary judgment on Schwarz's disability claim turns on whether or not she can establish, or establish a genuine issue of material fact as to, a *prima facie* case of disability discrimination under Iowa law.

#### 1. Elements Of A Disability Discrimination Claim Under Iowa Law

Iowa Code § 216.6 (formerly § 601A.6) makes it an unfair or discriminatory employment practice to discharge any employee "because of" a disability "unless based upon the nature of the occupation." Iowa Code § 216.6; *Sierra v. Employment Appeal Bd.,* 508 N.W.2d 719, 722 (Iowa 1993). The elements of a case of disability discrimination under Iowa law are that the plaintiff must prove that he or she (1) has a disability; (2) was qualified for the position; and (3) was discharged because of his or her disability. *Boelman v. Manson State Bank,* 522 N.W.2d 73, 79 (Iowa 1994). Thus, the *prima facie* case the plaintiff must present is as follows:

(1) that the employee belongs to a protected group; (2) that the employee was qualified to retain the job; (3) the employee was terminated; and (4) it is more likely

---

**10.** The College admits that Vera Osland may initially have given Schwarz the impression that the change was required by accreditation standards, but argues that this misapprehension was promptly dispelled when Schwarz contacted Ka-

thy Brock, who advised her that the change was owing to changes in patron demands. The College asserts that Ms. Brock's explanation has been consistently adhered to since it was first given.

than not that the termination was based on an impermissible consideration.

*Miller v. Sioux Gateway Fire Dep't,* 497 N.W.2d 838, 840 (Iowa 1993) (citing *Hamer, infra*); *Henkel Corp. v. Iowa Civil Rights Comm'n,* 471 N.W.2d 806, 809 (Iowa 1991); *Hamer v. Iowa Civil Rights Comm'n,* 472 N.W.2d 259, 264 (Iowa 1991). If the plaintiff establishes a *prima facie* case by the preponderance of the evidence, the burden then shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, non-discriminatory reason for its actions. *Smith v. ADM Feed Corp.,* 456 N.W.2d 378, 385 (Iowa 1990). The court will consider in turn each of these requirements as they relate to Schwarz's claim.

### 2. Analysis of Schwarz's disability claim

#### a. Protected disability

The threshold inquiry is whether the plaintiff can show that he or she is a disabled person subject to protection under Iowa Code § 216.6. *Miller,* 497 N.W.2d at 841; *Henkel Corp.,* 471 N.W.2d at 809; *Monson v. Iowa Civil Rights Comm'n,* 467 N.W.2d 230, 232–33 (Iowa 1991). Under Iowa law, a handicapped or disabled person is defined as "any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such impairment." *Miller,* 497 N.W.2d at 841; *Henkel,* 471 N.W.2d at 810; *Probasco v. Iowa Civil Rights Comm'n,* 420 N.W.2d 432, 434 (Iowa 1988). Although the impairment must significantly decrease the plaintiff's ability to obtain satisfactory employment otherwise, *Henkel,* 471 N.W.2d at 810; *Probasco,* 420 N.W.2d at 436, the plaintiff need not be "almost unemployable because of [the plaintiff's] impairment to be considered disabled." *Henkel,* 471 N.W.2d at 810. Rather, the plaintiff's disability must limit one or more of the plaintiff's "major life activities," which have been defined in 161 Iowa Admin.Code § 8.26(3) as including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Henkel,* 471 N.W.2d at 810; *Monson,* 467 N.W.2d at 233; 161 Iowa Admin.Code § 8.26(3). Additionally, the impairment must "disqualif[y] [the employee] from a wide range of other available jobs." *Hollinrake v. Law Enforcement Academy,* 452 N.W.2d 598, 604 (Iowa 1990).

**i. Schwarz's asserted disability.** Schwarz asserts that her disability is "night blindness." The medical reports submitted as part of the summary judgment record do not specifically define "night blindness," nor does the court find that it is a term defined in medical dictionaries available to the court. However, Dr. Gohman, Schwarz's treating optometrist, described Schwarz's vision impairment just prior to her termination as amblyopia of the right eye coupled with light sensitivity. "Amblyopia" is defined as "impairment of vision without detectable organic lesion of the eye," and "nocturnal amblyopia" is "abnormal dimness of vision at night." *Dorland's Illustrated Medical Dictionary,* 27th ed. (hereinafter "Dorland's"), 56. In his subsequent report, dated February 27, 1995, Dr. Gohman described Schwarz's vision problem as "anisometropia," which is a "a difference in the refractive power of the two eyes," *Dorland's,* 90, resulting in essentially monocular vision, which is less effective for determining depth perception clues in night-time conditions.

Dr. Jones, who examined Schwarz at the College's request, agreed that Schwarz had depth perception problems, but believed that they could be improved with a change in prescription. The medical experts roughly agree on Schwarz's visual acuity, both corrected and uncorrected. Dr. Gohman, in his February 27, 1995, report provides the following acuity measurements: unaided, RE 20/200, LE 20/30, BE 20/30, and corrected with present prescription, RE 20/200, LE 20/25, BE 20/25. His diagnosis prior to Schwarz's termination indicated unaided visual acuity of RE 20/200, LE 20/30, and corrected vision of RE 20/200, and LE 20/25. Dr. Jones's measurements of visual acuity with current prescription were RE 20/200, LE 20/25, BE 20/20. However, Dr. Jones suggested that Schwarz's vision could be corrected with a change in prescription to RE 20/30 +, LE 20/20, BE 20/15.

***ii. Vision impairments generally.*** A review of cases reveals a spectrum of vision impairments from total blindness, considered a disability, *see, e.g., Carter v. Bennett,* 840 F.2d 63 (D.C.Cir.1988) (blindness a protected disability); *Norcross v. Sneed,* 755 F.2d 113 (8th Cir.1985) (same); *Johnson v. Legal Serv. of Ark.,* 813 F.2d 893 (8th Cir.1987) (same), to seriously impaired vision, which may be a disability, *see, e.g., Colorado Civil Rights Comm'n v. North Washington Fire Protection District,* 2 A.D.Cas. 1545, 772 P.2d 70 (Colo.Sup.Ct.1989) (poor uncorrected vision a disability), to near normal corrected vision, considered not to be a disability. *See, e.g., Chandler v. City of Dallas,* 2 F.3d 1385, 1390 (5th Cir.1993) (holding that vision that can be corrected to 20/60 does not constitute a handicap in light of rule in the circuit that vision that can be corrected to 20/200 does not constitute a handicap, citing *Collier v. City of Dallas,* 798 F.2d 1410 (5th Cir.1986) (unpublished), and further finding that plaintiff had testified that his vision did not substantially limit any major life activity), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994); *Walker v. Aberdeen–Monroe County Hosp.,* 838 F.Supp. 285, 288 (N.D.Miss.1993) (holding vision that can be corrected to 20/30 is, as a matter of law, not a handicap, citing *Chandler* ). In between are cases in which the employee had suffered the loss of one eye, *Smith v. Upson County, Ga.,* 3 A.D.Cas. 1052, 859 F.Supp. 1504 (M.D.Ga. 1994) (employee had failed to show disability discrimination based on loss of one eye where employer was unaware of loss of eye), or had other specific sorts of visual impairments. *Walker v. Aberdeen–Monroe County Hosp.,* 838 F.Supp. 285, 288 (N.D.Miss.1993) (sarcoidosis and cataracts not disabilities where vision could be corrected to near normal); *Norris v. St. Joseph Hosp., Inc.,* 2 A.D.Cas. 1130, 1992 WL 531464 (D.Md.1992) (glaucoma did not qualify employee as "qualified handicapped person" where employee failed to show she could perform essential functions of job with or without reasonable accommodation), *aff'd,* 993 F.2d 1538 (4th Cir.1993) (Table); *Kuchta v. Westinghouse Electric Corp.,* 2 A.D.Cas. 803, 1992 WL 510994 (W.D.Pa.1992) (eye infection proffered as disability upon which discrimination was based,

but discharge was shown to follow three incidents of poor performance).

Schwarz's corrected vision appears to put her very near the normal corrected vision end of the spectrum, and, in its uncorrected state, still does not meet the Fifth Circuit's 20/200 rule for a disability. However, her claim of a specific impairment, trouble with night vision or "night blindness," has not been specifically addressed in any case known either to the parties or the court. However, the court need not decide whether "night blindness" is a protected disability, per se, because it must also consider whether Schwarz's alleged disability imposes limitations on her employment before she can be found to be a member of the protected class.

■ ***iii. The limitation imposed by the impairment.*** The College asserts that whatever Schwarz's visual limitations may be, and whatever effect they may have on her ability to drive at night, Schwarz is not disqualified from a wide range of other available jobs. In *Hollinrake,* the Iowa Supreme Court reiterated the standards for the degree of impairment necessary to constitute a protected disability previously stated in *Probasco,* 420 N.W.2d 432, 436 (Iowa 1988):

> The degree to which an impairment substantially limits an individual's employment potential must be determined with reference to a number of factors: the number and type of jobs from which the impaired individual is disqualified, the geographical area in which the individual has reasonable access, and the individual's job training, experience and expectations. An impairment that interferes with an individual's ability to do a particular job but does not significantly decrease the individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute.

*Hollinrake,* 452 N.W.2d at 604 (quoting *Probasco* with other citations omitted). While the plaintiff in *Hollinrake* was limited in the particular job of being a peace officer, because of deficiencies in his visual acuity, the court held that he was "not limited in any significant way from obtaining other satisfac-

tory employment," and thus was not "truly disabled" such that he could engage the protection of the Iowa Civil Rights Act. *Id.*

The court notes that Schwarz is impaired in the "major life activity" of seeing, and the College has itself injected an issue of fact into these proceedings concerning the nature and extent of that disability. However, the court concludes that Schwarz is not "disabled" within the meaning of the Iowa Civil Rights Act, because there was no evidence in the record that she is "limited in any significant way from obtaining other satisfactory employment," or disqualified from a wide range of other available jobs.[11] To the contrary, it appears from the record that Schwarz's alleged disability would not impair her ability to perform any job during daylight hours. She has, after all, been working satisfactorily on a typical full-time day shift schedule for some years.[12] Her impairment has not been shown to have a negative effect on her performance of any task except night driving. The court concludes that Schwarz has failed to meet her *prima facie* burden of showing that she is disabled within the meaning of Iowa's anti-discrimination law protecting disabled persons. Thus, Schwarz's disability discrimination claim must fail. However, the court will also consider the remaining elements of Schwarz's *prima facie* case of disability discrimination.

### b. Qualified for the position

■ The court finds Schwarz's attempts to carry her burden or to establish a genuine issue of material fact as to the second element of her disability claim, whether she was "qualified" for the employment from which she was allegedly discharged, to be problematical. Under Iowa law, as under federal law, whether a person is "qualified" for a position depends upon whether that person's disability can be reasonably accommodated. *Boelman,* 522 N.W.2d at 79. An employer must accommodate an employee's disability unless "the accommodation would impose an undue hardship." *Id.* (citing both 45 C.F.R. § 84.12(a) (1993), and 161 Iowa Admin.Code §§ 8.27(6), 8.28 (1993)); *Sierra,* 508 N.W.2d at 722 (Iowa Code § 216.6 requires employers to make "reasonable accommodations"); *Foods, Inc. v. Iowa Civil Rights Comm'n,* 318 N.W.2d 162, 167 (Iowa 1982). Thus, under Iowa law, a person "is qualified if [the person], with or without reasonable accommodation, 'can perform the essential functions of the position in question without endangering the health and safety of [the person] or others....'" *Id.* at 80. This standard imposes a two-prong test upon the plaintiff: (1) can the plaintiff perform the "essential functions" of the job, and (2) whether any reasonable accommodation by the employer would enable the plaintiff to perform those functions. *Id.*

■ To put it another way, the standard for whether a person is qualified for a job requires the court to consider "the individual's ability to perform the job in a reasonably competent and satisfactory manner given reasonable accommodation by the employer." *Henkel,* 471 N.W.2d at 810; *Cerro Gordo County Care Facility,* 401 N.W.2d at 192; 161 Iowa Admin.Code § 8.27(6). There is no genuine issue of material fact that Schwarz was and had always performed the job itself in a reasonably competent and satisfactory manner without any accommodation to her vision problem. Her vision problems only presented difficulties in her employment when they made it difficult for her to commute home from work after dark. The court must consider the question of whether this difficulty could be reasonably accommodated.

---

11. Although the court could indulge in speculation to consider the extent to which a person living in a small town, as does Schwarz, with the vision problems Schwarz has would be limited in her employment prospects. However, it was Schwarz's burden to produce evidence that she is "disabled" within the meaning of Iowa law. She has failed of this burden, in part because she has failed to show what, if any, effect her alleged disability has on her employment possibilities.

12. Although neither party had briefed the issue, the court inquired at oral arguments whether it was significantly darker at 9:00 p.m. in September than at 4:30 p.m. during the winter months in northern Iowa such that plaintiff could not drive after 9:00 p.m. in September, but had been able to drive after work in the late afternoons during the winter months. However, the lack of record evidence or argument on relative conditions would render the court's consideration of this question impermissibly speculative.

Neither Iowa nor federal law requires the defendant to change the essential nature of the job in order to accommodate the disabled employee's deficiencies. *Boelman,* 522 N.W.2d at 81. However, "[r]easonable accommodation by the employer may take many forms." *Sierra,* 508 N.W.2d at 722 (quoting *Cerro Gordo County Care Facility v. Iowa Civil Rights Comm'n,* 401 N.W.2d 192, 197 (Iowa 1987)). "Reasonableness" is a "flexible standard" and "must be measured not only by the disabled employee's needs and desires, but also by the economic and other realities faced by the employer." *Sierra,* 508 N.W.2d at 722 (quoting *Cerro Gordo County Care Facility,* 401 N.W.2d at 197). Thus, a "reasonable accommodation must be made by an employer only if it does not substantially impinge on the rights of other employees or incur more than de minimis costs to the employer." *Miller,* 497 N.W.2d at 842 (quoting *Brown v. Hy-Vee Food Stores, Inc.,* 407 N.W.2d 598, 599 (Iowa 1987)); *Smith,* 456 N.W.2d at 386; *Davenport v. City of Des Moines,* 430 N.W.2d 405, 408 (Iowa 1988). For example, where the accommodation might slow the employer's business or require the employer to hire outside employees to do the work, the accommodation comes at more than de minimis cost to the employer. *Smith,* 456 N.W.2d at 386.

The Iowa Supreme Court recently addressed the allocation of burdens on the issue of reasonable accommodation in *Boelman v. Manson State Bank,* 522 N.W.2d 73 (Iowa 1994):

[T]he must produce enough evidence to make a facial showing that reasonable accommodation is possible.

Upon such a showing, the burden shifts to the employer to prove that it is not able to accommodate the plaintiff's disability or that the proposed accommodation is unreasonable. An accommodation is unreasonable if it requires the employer to change the essential nature of the job or if it places undue burdens on the employer. *Boelman,* 522 N.W.2d at 80 (citations omitted). The court reads this requirement to impose upon the plaintiff a duty to propose an accommodation before the burden shifts to the defendant to show that the proposed accommodation is unreasonable. The court has some doubt that Schwarz has met this burden to show that reasonable accommodation is possible, because of the nature of the accommodations she suggested or which she implied were appropriate in her contacts with her superiors.

The court's perusal of the record did not indicate that Schwarz made any explicit request for a particular accommodation; nor does she argue that any particular accommodations were possible. Rather, at oral argument, counsel for plaintiff candidly and honestly admitted that Schwarz had never asked for a specific accommodation, and does not do so now. Schwarz's efforts to secure a different work schedule amounted to the following: (1) she told her supervisors that the shift change would make it difficult for her to drive home from work, perhaps thereby asking their assistance in finding an alternative; and (2) she inquired why the prior work schedule could not simply be maintained.

The court concludes that an employee's request that the employer come up with an alternative does not amount to the same thing as demonstrating that an accommodation is possible.[13] However, a request that an employer maintain the status quo for schedules or other working conditions may amount to a showing that the status quo is a possible and reasonable accommodation. Admittedly, *reasonable accommodations usually require some affirmative action on the part of the employer.*[14] However, where

---

**13.** *The court has some doubt as to the appropriateness of allocating to the plaintiff employee the burden of proving an accommodation is possible. The employer may be more likely to know what a particular position requires in terms of performance and what kind and degree of accommodation is either available or possible to meet the employer's performance requirements. However, the burden under Iowa law is initially laid* upon the plaintiff to show that an accommodation is possible, and this court must apply the law as it finds it.

**14.** Reasonable accommodations generally take the form of some affirmative action by the employer to alter the working conditions to make them more amenable to the disabled individual, rather than maintaining the status quo. For

past arrangements have worked well, and there is no compelling need to change them, change for the sake of change could be merely arbitrary, or intended, as plaintiff argues here, to force out certain employees who, for whatever reason, are unable to adjust to the change. The lack of evidence supporting a need to change working conditions may also cast some doubt on the legitimacy of an employer's decision to impose those conditions, suggesting that the employer's decision to change conditions was a pretext to discrimination against the disabled employee, although that evidence becomes relevant in the third phase of analysis of a discrimination claim. Where the change is reasonably necessary, but the status quo for a particular employee can be maintained without undue hardship to the employer's decision to change conditions, the status quo might still be a reasonable accommodation for that employee.

On the other hand, it could be argued that even if past arrangements have worked well for some time, the status quo is neither a possible or reasonable accommodation under present or future conditions. If it were, employers could be severely limited in their ability to adjust to new circumstances. The court does not believe that the laws against disability discrimination require the employer to hold still in the face of significant changes in the business conditions. In the first phase of the analysis, the employee bears the burden of producing evidence on the elements of his or her claim, including evidence that the employee is qualified for the position in question, sufficient to support a *prima facie* case. In view of its conclusion that Schwarz has failed to generate a genuine issue of material fact that she has a protected disability, however, the court need not decide whether Schwarz has generated a genuine issue of material fact that she is qualified for the position based on the novel suggestion that maintenance of the status quo could constitute a reasonable accommodation.

### c. Remaining elements of the prima facie case

■ Because the court has concluded that Schwarz has failed to present one of the essential elements of her *prima facie* case of disability discrimination, a protected disability, the court will not reach the third and fourth elements, that Schwarz was "terminated" and that the termination "is more likely than not . . . based on an impermissible consideration." *Miller*, 497 N.W.2d at 840–41. However, the court has already considered whether Schwarz was constructively discharged, answering that question in the affirmative, for summary judgment purposes. Although the court has some concerns about whether a proper causal connection can be shown, the court does believe that where, as plaintiff's counsel explained what happened, the employee's disability served as a means to effect her termination, the employee was terminated "because of" her disability. Unfortunately for plaintiff's case, an adequate showing on some of the elements of her *prima facie* case is not enough to prevent summary judgment in light of failure to show that Schwarz has a protected disability.

The Iowa Supreme Court has recognized that a plaintiff claiming disability discrimination has a "small target" at which to aim: the plaintiff must show that his or her "physical impairment qualifies as serious enough to bring it within the ambit of the civil rights Act, but is not so serious as to place [the plaintiff] beyond the need for reasonable accommodation by [the plaintiff's] employer." *Brown*, 407 N.W.2d at 599. Schwarz's attempt to show a serious enough impairment has gone wide of this tiny mark. The College's motion for summary judgment is granted as to Schwarz's disability discrimination claim.

### V. CONCLUSION

The court concludes that the College's motion for summary judgment must be denied

---

example, reasonable accommodations identified by 161 Iowa Admin.Code § 8.27(6) include "[m]aking facilities used by employees readily accessible to and usable by handicapped persons, and . . . [j]ob restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions," but these accommodations must still be weighed against the hardships they might impose upon the employer based upon the specific circumstances of that employer. *See Davenport*, 430 N.W.2d at 407.

 

as to Schwarz's age discrimination claim under the ADEA. First, Schwarz has established a *prima facie* case of age discrimination: she was a member of the protected group on the basis of her age, 63 at the time of her termination, her performance of her job was adequate prior to her termination, and she was replaced by a younger person. The difficult issue on Schwarz's age discrimination claim is whether or not she could show that she was constructively discharged from her employment or merely quit. The court concludes that there is a least a genuine issue of material fact that the College knew, or should reasonably have foreseen, that requiring Schwarz to work a shift ending in the late evening would force her to make a choice between quitting or enduring the intolerable condition of attempting to drive at night against a doctor's advice and at some risk to her health and safety. The court concludes that the College did not show that a reasonable person similarly situated to the plaintiff here would not find it intolerable to work the afternoon to evening shift. The court is persuaded that the trier of fact should, in the first instance, consider the evidence that the College exploited Schwarz's personal circumstances, known to the College, for the purpose of forcing her to quit her job.

The court also concludes that Schwarz has established a genuine issue of material fact as to the credibility of the proffered legitimate reason for the College's actions. Schwarz demonstrated that there have been varying explanations, some of doubtful credibility, for the College's decision to change the work schedule in the library. The trier of fact is entitled to consider whether the assertions that age was not a factor and that the rescheduling decisions were legitimate are creditable in light of all of the evidence.

However, the court concludes that the College's motion for summary judgment should be granted as to Schwarz's claim of disability discrimination in employment. The court finds that Schwarz has failed to establish or to generate a genuine issue of material fact that she is disabled within the meaning of the Iowa Civil Rights Act. The record does not suggest that Schwarz is disabled, because there is no evidence in the record that she is

"limited in any significant way from obtaining other satisfactory employment," or disqualified from a wide range of other available jobs. To the contrary, it appears from the record that Schwarz's alleged disability would not impair her ability to perform any job during daylight hours. Although Schwarz has at least arguably made out the other three elements of her disability discrimination claim, she has failed to make the threshold showing of a protected disability. The College is therefore entitled to summary judgment on Schwarz's claim of disability discrimination. The College's motion for summary judgment is therefore granted in part and denied in part.

**IT IS SO ORDERED.**